**UNITED STATES of America,**

v.

**Edwin Bacus ASTRONOMO, Defendant.**

**No. CR. 00–10311–NG.**

United States District Court, D. Massachusetts.

Nov. 26, 2001.

Amending Memorandum Dec. 20, 2001.

Robert L. Sheketoff, Sheketoff & Homan, Boston, MA, for Edwin Bacus Astronomo.

Michael P. Doolin, Dorchester, MA, for Anna N. Tran.

Frank J. Santisi, Westwood, MA, for Toan Kim Tran.

Richard L. Hoffman, U.S. Attorney's Office, Boston, MA, for U.S.

**SENTENCING MEMORANDUM**

GERTNER, District Judge.

### TABLE OF CONTENTS

I. *BACKGROUND* ................................................................ 161

II. *THE INDICTMENT* ......................................................... 164
 A. *Before Judge Gertner* ............................................. 164
 B. *Before Judge Tauro* .............................................. 164

III. *THE BASIC GUIDELINE COMPUTATION* ........................... 164

IV. *CONTESTED SENTENCING ISSUES* ................................. 165
 A. *Amount Laundered—Issues of "Relevant Conduct"* .......... 165
 1. Amounts Mentioned in the Ongoing Negotiations with *the Trans and Kenny, but Never Laundered* ........................ 166
 a. *June 10, 1997: Astronomo/Frenzo/Tran Conversation* ............... 166
 b. *January 18, 1998: Nelson/Astronomo* ............ 166
 c. *March 18, 1996: Davis/Astronomo/Kenny* ...................... 167
 2. Amounts Mentioned in Discussions with Other *Launderers* .............. 167
 a. *Law of Attempts* ............................................. 167
 b. *Law of Conspiracy* ........................................... 170
 c. *The Specific Transactions* .................................. 171
 (1) *January 20, 1996—James "Waxie" Schneider* .................. 171
 (2) *January 20, 1996: Peter Ip* ............................... 171
 (3) *March 1996: "Roger from Hong Kong"* ...................... 171
 (4) *Duany/Rae* ............................................... 171
 (5) *"Skinny" Kazonis* ........................................ 172
 (6) *Miscellaneous Evidence* .................................. 172
 B. *Role in the Offense* ............................................. 173
 C. *Criminal History* ............................................... 174
 D. *Summary* ........................................................ 175

The sentencing of Edwin Bacus Astronomo (hereinafter "Astronomo") raises a host of troubling issues. The facts the government seeks to establish concerning the criminal conduct of the defendant and his prior criminal history bear little relation to the allegations in the indictment, the facts to which the defendant pled guilty, or his actual criminal record.

The indictment charges Astronomo with conspiracy and attempted money laundering under 18 U.S.C. § 1956(h) and 18 U.S.C. § 1956(a)(3)(B) and (C). He introduced two undercover agents to the alleged launderers, Anna and Toan Tran (hereinafter "the Trans"), vouched for the agents on the one hand, and promoted the money launderers on the other. The amount alleged is $ 84,000. A related indictment before another Judge of this Court charges Astronomo with conspiracy and laundering money through Man Kin Chan (known as "Kenny"); the amount alleged is $20,000.[1] In addition, Astronomo, age 46, has no criminal record, just a single arrest for disorderly conduct, eight years ago, which was continued without a finding and then dismissed.

But the government suggests that Astronomo is responsible for a much larger

---

**1.** Astronomo pled guilty to conspiracy and money laundering in a case pending before the Honorable Joseph L. Tauro. (Dkt.# 00– 10310–JLT). Sentencing in that case will follow the instant one.

amount of laundered funds, more than double that for which he was indicted, that Astronomo is responsible for many crimes, wholly unrelated to the accusations in this case, and finally, that he was really a manager or organizer of an "otherwise extensive" crime scheme. They seek sentencing enhancements, in short, based on the amount laundered, his criminal history and his role in the offense.

## I. BACKGROUND

Before addressing these specific enhancements, I want to put this sentencing in context: It is not unusual for adversaries to draw different pictures of the case. What is unusual here is the distance between the two, and worse, how little is resolved by the defendant's guilty plea and the formal record.

The defendant paints the following picture: Born in the Philippines and now a naturalized citizen with nearly twenty years in this country, Astronomo scratched out a living as a maintenance man by day (at Quikcrete, a cement and concrete company), and as a doorman at a nude bar and later, at the counter of a "adult" book store in Boston's "Combat Zone" at night. He lived modestly, and received at best a few hundred dollars from his participation in the charged money laundering scheme. Apart from the disorderly conduct charge, he has never been arrested; he has had absolutely no contact with law enforcement authorities before this case and the one before Judge Tauro. He claims that these charges derive from his relationship with Roger Nelson, a man who helped him when he first arrived in Boston. When Nelson, who had a number of criminal contacts in the Combat Zone, became a cooperating witness for the government,

he fed Astronomo names of money launderers and encouraged him to set up the deals to which Astronomo pled guilty. Nelson, the defense claims, used Astronomo to buttress his position with the federal authorities. Out of loyalty to Nelson, Astronomo agreed.

The government's picture could not be more different: Notwithstanding the allegations of this indictment, and the related one before Judge Tauro, Astronomo is an important player in a web of money laundering schemes, far beyond those to which he has pled guilty. He introduced the agents to perhaps twenty potential money launderers from 1995–1999; conversations "about" future money laundering followed with each of the alleged launderers. His role went beyond just introducing one to the other; he took part in discussions about money laundering, effectively facilitating their completion. Notwithstanding the absence of any criminal record, the government claims, Astronomo is closely connected to the Italian Mob, particularly, William "Skinny" Kazonis and has, quite literally, gotten away with murders and assaults.

By raising these issues at sentencing, the government bypasses the more stringent mechanisms of proof under the Constitution—indictment, trial—and chooses to litigate complex factual and legal issues in what one commentator described as a "second string fact finding process."[2] Not only were the accusations the government now makes not subject to any trial, the government did not bother to investigate many of them. Rather the government relies on the defendant's comments to undercover agents which it claims were accurate, but which the defendant calls

---

2. Gerard E. Lynch, *The Sentencing Guidelines as a Not–So–Model Penal Code,* 10 Fed.Sent. Rep. 25 (July/August 1997).

"puffing." Did Astronomo really kill an accountant by drowning him in "cement shoes" or was he just trying to impress the agent? Was he an enforcer for the Mob, or just the counter man at a dirty book store?

In fact, the government was not after Astronomo at all. It was after William "Skinny" Kazonis, an alleged Mob figure, who Nelson suggested the government could "get" through Astronomo. But while Astronomo "puffed" about his close ties to Kazonis, in four years he was unable to effect any transactions with him. Proceeding only against Astronomo and the actual money launderers, the Trans, in the case before me, and against Kenny, in the case before Judge Tauro, the government had two major witnesses.[3] It called an FBI undercover agent based in San Diego, Mark Davis [hereinafter "Davis"], who had contacts with Astronomo between 1995 and 1997, when the FBI discontinued its investigation. In addition, the government called a state trooper, Mark Frenzo [hereinafter "Frenzo"], who met with Astronomo between 1997 and 1999, when he was working with U.S. Customs authorities. The Customs authorities were ostensibly taking up where the FBI left off.

What is curious about these witnesses is that neither man was involved in the ongoing and rather elaborate investigations of the Boston Mob taking place at or near the same time.[4] Indeed, neither had any up to date information about who was who in the Boston Mob, who was under investigation and who was not. As a result, neither could corroborate the bona fides of Astronomo's Mob references and supposed Mob ties. While there may have been other cooperating witnesses or agents who were more "in the know," none were called.

Roger Nelson, Astronomo's friend, who introduced him to Davis and then Trooper Frenzo, could not be called as a witness. He had died in September of 1998. Even if he had lived, however, it is not at all clear whether he would have been a government witness. By the time of this proceeding, Nelson had been thoroughly discredited, at least in the eyes of Davis. He had e-mailed a number of law enforcement authorities expressing his unhappiness with the way the FBI was handling the case, trying to "sell" his services to others. Some of the statements made in that e-mail, about pending investigations, and specifically about Astronomo, were conceded by the FBI to be wholly false. Indeed, on February 3, 1997, labeling his conduct "egregious," Davis recommended to his superiors that Nelson no longer serve as a cooperating witness. Significantly, however, Nelson continued to work for Trooper Frenzo after that date.

Ideally, trials or pleas, with due process safeguards, will resolve most factual issues. At a trial, the government's proof is tested before a jury and with the highest

---

3. In addition the government called Jose Acosta, a Boston police officer who arrested Astronomo for disorderly conduct in 1993. *See* Section IV, *infra.*

4. The government cited to published cases to dramatize Kazonis' role as an associate of Gennaro Angiulo, an "underboss" of the Patriarca organized crime family. *United States v. Angiulo*, 847 F.2d 956, 960–62, 969–70, 973–74 and n. 23 (1st Cir.1988); *United States v. Cintolo*, 818 F.2d 980, 986–88 (1st Cir. 1987); and, *United States v. Kazonis*, 530 F.2d 962 (table). The cases point to Kazonis' activities some ten years before Astronomo's activities. No witness testified to what, if anything, Kazonis was doing after his release from imprisonment. More recent cases, notably, *United States v. Flemmi*, 225 F.3d 78 (1st Cir.2000) suggest that the FBI had great success in infiltrating the Boston Mob and had considerable reliable information about its activities. The contrast with the information presented to me at sentencing is striking.

evidentiary standard, beyond a reasonable doubt. In a plea, when the defendant expressly waives those formalities, essential factual questions are generally put to rest in the plea colloquy. Sentencing, with more perfunctory procedures, arguably should resolve the more typical sentencing issues, like the defendant's background or the significance of his formal criminal record. Not so here. Instead, I was asked to try other very serious crimes—money laundering with other suspects, murders and assaults—crimes that were not investigated, confirmed or corroborated.

Pre–Guidelines there would have been nothing troubling about the government's approach. Prior to the passage of the Sentencing Reform Act,[5] prosecutors and/or probation officers would seek to introduce evidence about other crimes, related and unrelated, often uncorroborated.[6] The judge had discretion to give such "facts" whatever weight the court believed to be appropriate. With the Guidelines, however, accusations, if found true by a preponderance of the evidence, often have specific, and sometimes onerous, consequences. For example, this defendant's sentence will be substantially affected by a finding that $200,000 or more, has been laundered, or a finding that his criminal history Category should be Category III, not Category I.

In short, sentencing has profoundly changed. The issue is not whether Astronomo was involved in laundering "more" than the indictment alleges. The issue is:

How much more? It cannot be that both of the following statements are true: When a judge finds a specific fact—the precise amount of money laundered—he or she has "no choice" but to impose the Guideline consequences, a higher score, and often a higher sentence. *And* when a judge *cannot* find a specific fact—just the "sense" that there may be more here than meets the eye—he or she *also* has no choice but to impose the higher score and the higher sentence. The Guidelines are precise; I will enforce them precisely.

One further note: The defendant claims a violation of *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). There is none. The Court's formal holding was that "any fact (other than a prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury and proved beyond a reasonable doubt." 530 U.S. at 473–74, 120 S.Ct. 2348. The "enhancements" the government seeks here do not take the defendant's sentence beyond the range established by defendant's guilty plea. But dicta in the majority and the concurrences suggests wider concerns which *are* dramatized by this case—that more and more issues of consequence, issues that could directly impact on the defendant's liberty are being litigated at sentencing, rather than at jury trials. *See e.g. United States v. Wilkes*, 130 F.Supp.2d 222, 231–32 (D.Mass.2001) (describing *Apprendi's* three tests—legislative, traditional, and impact).[7]

---

5. Pub.L. No. 98–473, 98 Stat. 1837 (1987).

6. *Williams v. People of State of New York*, 337 U.S. 241, 248, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949), was the classic example. A jury, after convicting the defendant of first degree murder, recommended life imprisonment. The judge disagreed and sentenced the defendant to death. While Williams had no criminal record, the judge relied on the presentence report, which contained information inadmis-

sible at trial, and concluded that defendant had in fact committed a string of uncharged burglaries and had a "morbid sexuality." *Id.* at 244, 69 S.Ct. 1079.

7. Justice Stevens notes:

... As a matter of simple justice, it seems obvious that the procedural safeguards designed to protect Apprendi from unwarranted pains should apply equally to the two

I appreciate the government's work; there may well be good and sufficient reasons for proceeding in this fashion. But the fact remains that after three days of testimony, myriad tapes and videotapes (which I have played and replayed), arguments of counsel, I cannot conclude, by a fair preponderance of the evidence, that the government's version of Astronomo's acts and background is the correct one. It may well be; I simply have no idea what was "really" going on, surely not enough to justify imposing the enhanced sentence the government seeks.

## II. *THE INDICTMENT*

### A. *Before Judge Gertner*

On August 24, 2000, Astronomo was indicted by a federal grand jury on one count of a money laundering conspiracy in violation of 18 U.S.C. § 1956(h) and 18 U.S.C. § 2 and one count of attempted money laundering in violation of 18 U.S.C. §§ 1956(a)(3)(B) and (c) and 18 U.S.C. § 2. The indictment alleges that Astronomo "promoted" his codefendants, Anna Tran and Toan Tran,[8] as "money launderers" to potential customers, and that he introduced such customers to the Trans.

Four specific transactions are alleged: 1) On September 4, 1997, the Tran's were alleged to have laundered $18,000 in cash by a customer named "Louie" (who was the undercover agent Frenzo), which Louie represented to have been drug proceeds; 2) on October 9, 1997, another $20,000; 3)

February 20, 1998, another $ 15,000; 4) on March 4, 1999, Louie gave Astronomo $31,000, which the Trans declined to launder because it was "too hot."[9] The total amount laundered or attempted to be laundered, according to the indictment, was $84,000.

### B. *Before Judge Tauro*

In addition, Astronomo pled guilty to a separate money laundering conspiracy and substantive acts, conducted with a different launderer, Man Kin Chan (also known as "Kenny").[10] The amount involved in the second indictment is $20,000 (arising out of a transaction on May 11, 1999).

## III. *THE BASIC GUIDELINE COMPUTATION*

Astronomo has no criminal record. Seven years ago he was arrested for being a "disorderly person"; the charges were continued without a finding and then dismissed. If I simply sentenced on the basis of the amounts to which the defendant pled, and his criminal history, the Guideline computation would be as follows: a) Base offense of 20 (under U.S.S.G. § 2S1.1 (2001));[11] b) with the amount exceeding $100,000 but less that $200,000, add 1 (under U.S.S.G. § 2S1.1(b)(2)(c)); c) since the defendant was told by the undercover agents that the funds were drug proceeds, add 3 (under U.S.S.G. § 2S1.1(b)(1)); d) since the defendant pled guilty, deduct 3 for acceptance of responsibility (under U.S.S.G. § 3E1.1), for a total of 21, and a Guideline range of 37–46 months.

---

acts that New Jersey has singled out for punishment. Merely using the label 'sentence enhancement' to describe the latter surely does not provide a principled basis for treating them differently. *Id.* at 476, 120 S.Ct. 2348.

**8.** Anna Tran and Toan Tran have also pled guilty, but have not yet been sentenced.

**9.** This $31,000 is the subject of the "attempted money laundering" charge in Count 5. The

others are subsumed in Count 1, the conspiracy count.

**10.** Chan has been sentenced to 33 months incarceration with two years of supervised release.

**11.** The Guideline version used throughout this opinion is the 2001 edition.

The government argues that notwithstanding the allegations in the indictment, Astronomo is responsible for much, much more money laundering as "relevant conduct" (under U.S.S.G. § 1B1.3), surely over $200,000, adding two points and not one (under U.S.S.G. § 2S1.1(b)(2)(c)). Moreover, although he is charged as someone who simply "promoted" the Trans and Kenny as money launderers to the two undercover agents, in fact he is an "organizer" or "manager," and should get an enhancement of 4 points (under U.S.S.G. § 3B1.1(a)). Finally, the government claims that even though Astronomo has no record, his non-existent criminal history score under-represents his culpability. He has, according to the government, literally gotten away with murders and beatings, uncharged, uncorroborated, indeed uninvestigated. The government argues for a criminal history score of III. If I accepted the government's arguments, Astronomo's Guideline range would be doubled, 78 to 97 months.

I rejected the government's enhancement arguments for the reasons described below. But while I could not make findings with the precision required by the Guidelines, I heard enough to sentence Mr. Astronomo to the high end of the applicable range, 46 months.

### IV. *CONTESTED SENTENCING IS-SUES*

#### A. *Amount Laundered—Issues of "Relevant Conduct"*

In money laundering, as with many other offenses, the amount of money laundered is a proxy for the defendant's culpability; the more he or she launders, the more punishment he or she arguably deserves.[12] *See* U.S.S.G. § 2S1.1(b)(2). Each increment adds a point to the base offense level; the higher the base offense level, the higher the sentence. The government argues that the relevant conduct for Astronomo must take into account his "extensive and continuous criminal efforts, over a four year period, to launder the purported drug money of two successive undercover agents."

Specifically, the government would include not only (a) the amounts that *actually* changed hands in the Tran and Kenny laundering scheme, but also (b) the amounts that were mentioned in negotiations between Astronomo, the undercover agents, and the Trans and/or Kenny but never sought by the government for laundering; (c) amounts mentioned in conversations with other launderers to whom Astronomo had introduced the agents, which amounts were never actually laundered.

There is no contest as to category (a), the money that actually changed hands in the Tran and Kenny laundering schemes. Indeed, although the amounts mentioned in the two indictments total $104,000, both parties concede that Astronomo should be held responsible for $134,000, which included an attempt to launder proceeds with Kenny for which Astronomo was responsible.[13]

There is substantial contest as to the category (b) amounts mentioned in the on-

---

**12.** Another factor is whether the defendant believed that the funds were the proceeds of illegal drug distribution, which is conceded here. *See* U.S.S.G. § 2S1.1(b)(1). The agents took pains to tell the defendants that money represented drug proceeds.

**13.** This includes Tran laundering on September 4, 1997 ($18,000), October 9, 1997, ($20,-000); February 20, 1998 ($15,000); March 4, 1999, (attempted laundering of $31,000), the Kenny laundering on May 11, 1999 ($20,000), and an attempted laundering on June 19, 1999 ($30,000).

going negotiations with the Trans and Kenny but never laundered and category (c) amounts mentioned in conversations with other money launderers, but never laundered.

### 1. *Amounts Mentioned in the Ongoing Negotiations with the Trans and Kenny, but Never Laundered*

■ A defendant is held responsible for his own acts under U.S.S.G. § 1B1.3(a)(1)(A)—acts committed, aided, abetted or willfully caused by him as well as attempted criminal acts. *See id.* Cmt. n. 7. In addition, a defendant is held responsible for the acts of others: U.S.S.G. § 1B1.3(a)(1)(B) provides that a "jointly undertaken criminal activity" is a "criminal plan, scheme, endeavor, or enterprise, undertaken by the defendant in concert with others, whether or not charged as a conspiracy." Further, note 2 proves that a defendant "is accountable for the conduct (acts and omissions) of others that was both: (i) in furtherance of the jointly undertaken criminal activity; and (ii) reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). cmt. n. 2.

Applying these Guidelines, I decline to "count" as relevant conduct the amounts mentioned in general conversations with the Trans and Kenny for several reasons: The participants spoke in broad terms at the outset of their dealings, and from time to time during the course of their relationship. Their comments about laundering money were mixed with bragging about their various activities, obviously to get the agents' business or to keep it. And although it is not the only relevant evidence—the words used, the tone of voice of the participants, and the surrounding circumstances are also to be considered— one important indication of the scope of the agreement with the codefendants was what was actually laundered thereafter.

#### a. *June 10, 1997: Astronomo/Frenzo/Tran Conversation*

On June 10, 1997, Astronomo took Frenzo to meet the Trans, for the first time (an unrecorded conversation). Frenzo said that "I'd be laundering in excess of $50,000 to $100,000." Anna Tran, according to Frenzo, said "that wasn't that much." In addition, they spoke about what the Trans' fee would be, namely 15. Astronomo was present throughout. Frenzo did not say during what period of time this laundering would take place, or whether the amount mentioned was the total amount, or periodic installments. There was no mention of when the arrangements would be made and by whom. In any event, notwithstanding Frenzo's grandiose statement, and Anna Tran's grandiose answer, the first time that Frenzo laundered money with Tran was several months later, on September 4, 1997, and then for "only" $18,000. A month later, on October 9, 1997, an additional $20,000 was laundered through the Trans. The arrangements, in short, were ad hoc, depending upon the amounts Frenzo had, whether the Trans were ready. I will count the $18,000 and the $20,000. I will not count the $50,000 to $100,000 figure mentioned in the preliminary negotiations.

#### b. *January 18, 1998: Nelson/Astronomo*

Three months later, on January 18, 1998, Nelson reported to Astronomo that he and Frenzo had "maybe forty. Thirty, forty" thousand dollars. He added, "And then ah … I'm just going to keep it going, keep the door open." And he added, "yeah because ah, maybe I'm gonna have um … seventy-five to a hundred." Nelson reported to Frenzo that Astronomo had conveyed this information to the

Trans. Again, the Nelson–Astronomo conversation could not have been more general or more speculative. In any case, no such amounts were transacted. In fact, a month later, on February 20, 1998, Frenzo and Nelson placed $15,000 with the Trans. (While Astronomo did not directly participate in the February 20, 1998, transaction, it is conceded that he is to be held responsible because of his work in the initial stages.)

By April, the Frenzo–Tran connection was fraying. Frenzo complained about the Trans to Astronomo. Their commission was too high; one of the checks given to Frenzo for his cash bounced. Over a year later, on March 4, 1999, when Frenzo told Astronomo that he had another $31,000 for the Trans, they refused to handle it.[14] I will count only the February 20 transaction for $15,000 and the March 4 transaction for $31,000.

### c. *March 18, 1996: Davis/Astronomo/Kenny*

A similar pattern was followed with Kenny. On March 18, 1996, Agent Davis, accompanied by Astronomo, met with Kenny, and mentioned the need to launder $20,000–$30,000, or even more. No such amounts were laundered. It was not until over three years later, on May 12, 1999, that Trooper Frenzo, taking over from Agent Davis, placed $20,000 with Kenny. Within a month, on June 16, 1999, Frenzo tried and failed to place an additional $30,000 with Kenny (the attempted laundering already included in the amounts described above). Again, I will only count the $20,000 laundered on May 12, and the $30,000 which was supposed to have been laundered on June 16, 1999.

### 2. *Amounts Mentioned in Discussions with Other Launderers*

█ In addition to the amounts alleged in the Tran and Kenny conspiracies, the government alleges that I should include "the additional amounts involved in some, although far from all, of the occasions when Astronomo willingly associated himself with plans to launder other amounts of the agents' purported drug money between 1996 and 1999, and explicitly or implicitly agreed to assist the agents and coconspirators whom Astronomo had solicited and recruited in carrying out those plans."

The analysis here is complicated for several reasons. First, the amounts to which the government refers were mentioned in general conversations, like those described above—speculative, puffing at times, vague. Second, with a few exceptions, these were not recorded conversations; what was said was characterized by the agents involved. I was not able to hear the voices of the participants or the details of their negotiations which I must do in order to make the findings required of me. Finally, the amounts the government would have me credit as relevant conduct were discussed generally, but in fact, never laundered. Indeed, there is no evidence that the agents placed any money with the potential launderers thereafter, or even monitored whether any one else had placed money with them.

While I understand that the Guidelines require me to consider as "relevant conduct" not just the amount actually laundered, but the amount that the parties intended to launder, *United States v. Graciani*, 61 F.3d 70, 74 (1st Cir.1995); *United States v. Tejada–Beltran*, 50 F.3d 105, 110 (1st Cir.1995), in making that determi-

---

14. Nevertheless, I count this episode as an attempted laundering. Astronomo took the money and contacted the Trans.

nation I should not jettison the common law standards for criminal liability.

■ My starting point must be the substantive law of attempt and the substantive law of conspiracy, unless the Guidelines have expressly modified these standards.[15]

Based on that law, I conclude that the conversations with potential money launderers do not amount to relevant conduct under § 1B1.3(a)(1)(A) or (B) since no crime was either attempted or agreed to.

### a. *Law of Attempts*

■ The substantive law of attempts does not criminalize bad intentions or bad thoughts. The rules should be no different at sentencing. As LaFave and Scott have noted:

> The crime of attempt, ... consists of: (1) an intent to do an act or to bring about certain consequences which would in law amount to a crime; and (2) an act in furtherance of that intent which, as it is most commonly put, goes beyond mere preparation.

LaFave and Scott, Substantive Criminal Law, § 6.2 (1986). *See also, United States v. Doyon*, 194 F.3d 207, 210 (1st Cir.1999) (observing that there are two elements to attempt: (1) an "intent" to commit the substantive offense and (2) a substantial step towards its commission).

The government argues that there need not be any actual laundering for there to be an agreement to do so chargeable to the defendant, pointing to a line of cases which suggest that no overt act is required for a money laundering conspiracy under 18 U.S.C. § 1956(h). *E.g., United States v. Tam*, 240 F.3d 797, 802 (9th Cir.2001).

■ But the government confuses the law of attempts and the law of conspiracy. While there is no overt act requirement for conspiracy to launder under 18 U.S.C. § 1956(h), for attempted laundering under 18 U.S.C. § 1956(a)(3)(B) there must be a "substantial step" towards the completion of the crime.

In *Tam* the court used the Supreme Court's analysis in *United States v. Shabani*, 513 U.S. 10, 115 S.Ct. 382, 130 L.Ed.2d 225 (1994) as a template. Beginning its analysis precisely where I began mine in the instant case, the Supreme Court notes: "[A]bsent contrary indications, Congress intends to adopt the common law definition of statutory terms." 513 U.S. at 13, 115 S.Ct. 382. Common law conspiracy did not require an overt act in furtherance of it. When Congress enacted 21 U.S. § 846, it followed suit; the statute did not require, as did the general conspiracy statute, 18 U.S.C. § 371, that a conspirator "do any act to effect the object of the conspiracy." Applying the same analysis to § 1956(h), the *Tam* panel concluded that there was no overt act requirement for conspiracy to launder money.

■ As to attempted crimes, however, the common law rules are different. As LaFave and Scott note, "criminal attempts

---

**15.** It should be noted that § 1B1.3 indicates "the principles and limits of sentencing accountability under this guideline are not always the same as the principles and limits of criminal liability." U.S.S.G. § 1B1.3, Cmt. n. 7. This reference, however, underscores the fact that sentencing standards in this section are more rigorous than the usual conspiracy standards. A defendant may not be held responsible at sentencing for the acts of coconspirators when he did not foresee them or expressly agree to them. He may be responsible as a matter of substantive conspiracy law but not as a matter of sentencing law.

In contrast, the notes accompanying § 1B1.3 recognize the distinction between the completed crime and the "attempted" crime, even at sentencing, and define "attempts" in keeping with the traditional, substantive law definition. *See* U.S.S.G. § 1B1.3, Cmt. n. 7., § 2X1.1.

require proof of an intent to bring about the consequences set forth in the crime attempted, and this is so even though no such intent is required for the completed crime". *Id.* at § 3.5. Likewise, with respect to the act, "[a] substantial step is less than what is necessary to complete the substantive crime, but more than mere preparation." *United States v. Rodriguez,* 215 F.3d 110, 116 (1st Cir.2000).[16] The defendant's actions have to go beyond preparation and "corroborate strongly the firmness of the defendant's criminal intent." *United States v. Nelson,* 66 F.3d 1036, 1041 (9th Cir.1995). Put otherwise, the evidence must show that the crime "will take place unless interrupted by independent circumstances." *Id.* at 1042.

The facts of *Nelson* are instructive. The defendant was convicted of attempting and conspiring to structure a money laundering transaction. Undercover agents, posing as drug dealers, came to the car dealership where Nelson worked, proposing to buy a car with cash. Nelson and his codefendant suggested ways to structure the cash purchase of a car to avoid the reporting requirement. Nelson proposed that the agents buy a car under an assumed name; the supervisor of the two men rejected the proposal. Nelson proposed a trade-in scheme, involving used cars, to keep the purchase price under $10,000, and therefore not subject to reporting; the agents said they would "think it over." Then, when the deal could not be done at the dealership where Nelson and his codefendant worked, the codefendant referred the agents to another dealership, which he had called in advance, to "make the paper work right." The Ninth Circuit affirmed Nelson's conspiracy conviction, but reversed the attempted laundering.

The Court found that while Nelson plainly intended to structure the transaction, he did not take a "substantial step" towards the completion of the crime to qualify for an attempt. He did not break up a cash payment already received, *United States v. McLamb,* 985 F.2d 1284, 1286 (4th Cir.1993),[17] accept a cash payment, *United States v. Loehr,* 966 F.2d 201, 202–3 (6th Cir.), *cert. denied,* 506 U.S. 1020, 113 S.Ct. 655, 121 L.Ed.2d 582 (1992)[18], or prepare a detailed plan and receive payment, *United States v. Fuller,* 974 F.2d 1474, 1481 (5th Cir.1992).[19] Rather, he

---

**16.** U.S.S.G. § 2X1.1 mirrors these concerns. Guideline commentary cautions that in applying the Guidelines to attempted offenses only "specific offense characteristics" that are "determined to have been specifically intended or actually occurred" should count, and not "[s]peculative specific offense characteristics." Here, I find that the amounts mentioned in the meetings of the agents and potential money launderers comprise a "speculative specific offense characteristic[s]."

**17.** McLamb, who owned the car dealership, told the salesman to break up a $14,000 cash payments into two payments under $10,000, assisted in the transaction, and did not file a reporting form. He also advised an undercover agent in another transaction that there were ways to avoid reporting a cash payment of the car, advised him to break up the payment so each transaction would be under

$10,000, and discussed the deal when the agent arrived with the money. *Id.* at 1286–87.

**18.** In *Loehr,* the Sixth Circuit found a substantial step when a car sale designed to conceal drug proceeds through the use of an assumed name and the avoidance of the reporting requirement was at least half completed.

**19.** In *Fuller,* the Fifth Circuit found sufficient evidence that the defendant took a substantial step towards circumventing the currency reporting requirements, when he prepared a plan, refined it after communicating with the intended recipient of the money, demonstrated the commercial reasonableness of the plan to the government agent, received the money, and was on his way to deliver the money to the "sanitizing agent" when he was arrested.

was doing what his job suggested, keeping customers on the hook while his superiors finalized the offer—in short, mere preparation. His actions were too "tentative and unfocussed" to be an "appreciable fragment of the crime of avoiding a reporting requirement." *Id.* at 1043. To qualify for an attempted structuring, Nelson must have done more than merely discuss the possible ways to avoid the reporting requirements.[20]

### b. *Law of Conspiracy*

■ Nor do the general conversations about future money laundering with potential launderers qualify as acts in furtherance of a conspiracy to launder these amounts under § 1B1.3. The conversations do not necessarily suggest a real *agreement* at all, rather than a general "feeling out" of a potential launderer. Since there was nothing but the most general conversations about laundering money, at some point in the future, for a range of amounts, there is no "jointly undertaken criminal activity."

This was, after all, a government sting. As I have noted, the government chose not to place money with these "other" launderers. Nor did it have information that anyone else laundered money with them. Talking about laundering is hardly enough. The transcripts, after all, are filled with harebrained schemes and overblown ideas. I cannot say what was real and what was an embellishment.

The centerpiece of many of these conversations and perhaps the greatest "puffer" of all, was Roger Nelson, the cooperating witness who set up Davis and then Frenzo with Astronomo. As noted above, in 1997, in the middle of the Customs investigation with Trooper Frenzo, Nelson contacted other law enforcement agencies in order to "sell" his services. See Exhibits 18 and 19 (Report dated February 3, 1997). Nelson then sent an e-mail to a law enforcement official, with a nine page synopsis including purported details of the Boston investigation. Davis reported that it was "rife with fabrication and recollection of events which never occurred," "misinformation, speculation and inaccuracies." Nelson conceded to Davis that he "padded" the information in the e-mail to bolster his position with other law enforcement agencies, behavior which Davis found to be "egregious."

Nelson's impact in orchestrating meetings with other money launderers in Boston is hard to ascertain. The defense suggested that Nelson manipulated Astronomo into making the contacts. Telling Astronomo to set up meetings with × or y money launderer would enhance his status with the government. Astronomo, out of loyalty to Nelson who had helped him when he came to this country, did so. Agent Davis agreed that "every single person [Astronomo] introduced Davis to was someone that Roger Nelson knew." Moreover, Davis agreed that until the 1997 e-mail, Nelson was in regular contact with Astronomo, with some conversations taped, others not. On one tape, Nelson talked to Astronomo about not "putting all his eggs in one basket" and suggested

---

**20.** As with Astronomo, Nelson's proposals, the court concluded, were just talk. Significantly, the Court affirmed the conspiracy charge, noting to the differences between attempt and conspiracy law. Rendering its decision prior to the Ninth Circuit's decision in *Tam* and the Supreme Court's decision in *Shabani,* the panel concluded that an overt act was necessary for conspiracy to launder, but distinguished the overt act required for conspiracy, from that required for attempt: "[T]he overt act required as an element need not have as immediate a connection to the intended crime as the 'substantial step' required for an attempt." 66 F.3d at 1044 (citing to *Harper,* 33 F.3d at 1148.).

other money launderers to solicit in order to satisfy the agents.

Significantly, even after Davis had recommended terminating Nelson's services as a cooperating witness for the FBI for his "egregious" conduct and misrepresentations, Trooper Frenzo, acting for U.S. Customs, continued to use him and credit his information. Apart from Nelson, the agents themselves engaged in padding their criminal exploits and the scope of their activities. Exaggeration, puffing, embellishing, in short, were par for the course.

### c. *The Specific Transactions*

For example, the government would have me "count" the following as relevant conduct: [21]

#### (1) *January 20, 1996—James "Waxie" Schneider*

On January 20, 1996, Astronomo introduced or promoted Trooper Frenzo to nine others, including James "Waxie" Schneider. Davis talked to Schneider, in Astronomo's presence, about laundering $20,000 to $25,000 every two weeks. Since Davis testified generally about this encounter, I cannot judge whether it was a real attempt at money laundering or just idle chatter.

#### (2) *January 20, 1996: Peter Ip*

Apparently on the same day, Peter Ip was introduced to Davis by Astronomo. The government represented that Ip discussed several money laundering options, including $20,000 to $25,000 per week. There was no indication whether Astronomo was present during the discussions, whether specific details were discussed. No money was placed.

#### (3) *March 1996: "Roger from Hong Kong"*

"Roger from Hong Kong" was the most troubling testimony of all. Astronomo introduced Davis to "Roger" who represented that he would run money through the casino in Hong Kong, that Astronomo, Roger and Davis could go over to Hong Kong and see the operation themselves. Seeking more details, the prosecutor asked, "What did you observe about this Roger?" Agent Davis' testimony could not have been more vague, speculative or, for that matter, inappropriate:

> My impression from what I observed of Roger was that he was—his body language was such that he seemed to be what I gathered, you know, a top end organized crime or a criminal, at least, his language and the way he conducted himself, how he behaved towards me, to me was indicative from my experience, of being, you know, top level criminal in whatever word he was dealing in.

It is hard to imagine how these observations pass as evidence even in a sentencing proceeding.

#### (4) *Duany/Rae*

But the plan that appeared on the surface to be the most specific was the one with William Billy Rae and Louis Duany. Astronomo sent Davis a business plan concerning a new seafood business, which he said would launder an "indefinite amount of money." It was a standard business plan, describing what the business would do and what equipment it needed. The business would involve the storage and shipping of fresh seafood; it would be a cash business through which money could be laundered. Astronomo, Davis, Rae and

---

**21.** I use these as examples only. In fact, I have reviewed each and every transaction with potential launderers which the government cited or which was in the record.

Duany met to discuss it; the government videotaped the encounter.

I reviewed the videotape several times. Astronomo hardly said anything at all. The "plan" was nothing more than a glimmer in the eyes of Duany and Rae. They had no money—no trucks, no supplies, no warehouses, no employees. They "needed an influx of cash to get this thing started," perhaps over six months. "And then this could be done like every year. This is not, you know, this could be an ongoing thing because if you need a company ..," they reported, and Davis added, "as long as the company exists." The plans were entirely unformed; "[I]t depends upon how you wanna work it, you know ..." they noted. And it was farfetched; the FBI never followed it up.

### (5) "Skinny" Kazonis

The most significant potential launderer of all was supposed to be "Skinny" Kazonis. Astronomo knew Kazonis. He worked at the counter at Kazonis' store, the Downtown Bookstore. Kazonis was introduced to Davis at a party in Astronomo's home in 1996, but the FBI investigation ended in 1996 without any money being placed with Kazonis.

Trooper Frenzo pressed on, after the FBI investigation was discontinued. Astronomo was still unable to launder any money with Kazonis, notwithstanding the exhortations of Frenzo and Roger Nelson.

Frenzo characterized Astronomo's comments in a meeting that took place on April 18 or 19, 1998, because the conversation was not recorded: Astronomo indicated that Kazonis would launder drug money if the figure was large, i.e. $50,000. Frenzo reported that he would have $50,000 to $75,000 to launder "in the near future." Then Nelson and Frenzo "advised Astronomo that if he was not comfortable with approaching his boss, then he shouldn't on our behalf". While Astronomo said that he was comfortable approaching his boss, again nothing came of it.

On October 7, 1998, in another unrecorded conversation, Frenzo tried again. He reported that he had $50,000 to be laundered and that he would pay $5,000 for commission. Astronomo represented that he would present the offer to the "Old Man" (ostensibly referring to Kazonis) the next day. They arranged to meet. The following day Astronomo cancelled the meeting because he had been unable to meet with Kazonis, and suggested another launderer, Henry Chow. Then Astronomo reported that he had spoken to Chow, and everything was "all set." Again the contact failed; Astronomo admitted that he had not contacted Chow. Several days passed; after Astronomo finally set up a meeting, Chow did not appear. The transaction was never pursued.[22]

### (6) Miscellaneous Evidence

The defense claims that nothing about Astronomo's life or lifestyle suggests laun-

---

**22.** Contrast these vague discussions with the attempted money laundering I have "counted" in the Kenny conspiracy. On June 19, 1999, Trooper Frenzo contacted Astronomo and indicated that he wanted to launder money through Kenny. Astronomo told him that Kenny might not be ready; Frenzo nevertheless drove to Downtown Books with $32,000 in cash and suggested laundering the money through another, Kevin Huynh. When Frenzo pressed, saying that he could not wait because he had other things to attend to,

Astronomo suggested that Frenzo leave the money with him overnight, that Astronomo would try to place it with someone if he could, and return it if he could not. Astronomo called Kenny on Frenzo's cell phone and specifically tried to make arrangements for Kenny to get the money that evening. Those arrangements were unavailing. Frenzo declined the offer to use another launderer, Kevin Huynh. Laundering was plainly attempted.

dering activities at the level the government alleges. He received $300 from Davis for all his work, and perhaps $200 from Frenzo (who suggested it would be money for drinks). Even in the seafood business plan, he was supposed to get a small share of the company but mainly work for a salary; those involved in the laundering would presumably get a commission for each amount laundered. While Astronomo represented to Davis and Frenzo that he had substantial assets, and that houses were put in the name of his mother and his girlfriend to escape government scrutiny, there was no proof. His home was modest; he drove an old car. He had two jobs—maintenance man by day at Quickcrete cement, counterman at the adult bookstore, by night.

Astronomo may well have laundered more money than the transactions specifically described above with the Trans and with Kenny. There is surely an aroma of "more," but that is not enough. As I noted, the Guidelines require me to say "how much more," and here the record fails. I have no idea.[23]

## B. *Role in the Offense*

The government argues that Astronomo was the "organizer" of an "otherwise extensive" criminal organization warranting a four level upward adjustment pursuant to U.S.S.G. § 3B1.1(a). And even if the organization was not "otherwise extensive," and Astronomo was "only" a manager, his role warrants at least a two level increase.

Section 3B1.1(a) adjustments reflect concerns that larger organizations are more dangerous than smaller ones and that those in positions of leadership within them are more culpable. Guidelines Commentary notes, "persons who exercise a supervisory or managerial role in the commission of the offense tend to profit more from it and present a greater danger to the public and/or are more likely to recidivate." U.S.S.G. § 3B1.1; Cmt. background. *See, United States v. Footman,* 66 F.Supp.2d 83, 93 (D.Mass.1999), aff'd. *United States v. Footman,* 215 F.3d 145 (1st Cir.2000) (discussing the meaning of "otherwise extensive"). Typically, as the commentary indicates, leaders exercise decision making authority, recruit accomplices, claim a "larger share" of the fruits of the crime, and play an important role in planning and exercise control over others. U.S.S.G. § 3B1.1. cmt. 4.

■ The government's own description of Astronomo's role in the indictment belies the "leader" characterization. He "initiated contact on behalf of potential money laundering customers with the Trans, vouched for the customers to the Trans, obtained laundering rate information from the Trans on behalf of such customers and passed it along to the customers, arranged for customers to meet with the Trans, personally participated in meetings of customers with the Trans where money laundering was discussed." But he exercised no dominance or power over others; his share of the proceeds was minuscule; the terms of the transaction were set by others over whom he exercised no control.

As I noted, even if Astronomo laundered money multiple times, his role in each transaction remained the same. Just as a courier in a drug transaction remains a courier no matter how many trips she has taken, so a facilitator, like Astronomo, re-

---

**23.** The government also argues that the two cases should be considered separate and unrelated under U.S.S.G. § 3D1.3 and 4, which would increase the Guideline Range. There is no basis to do so. Both cases are related, due to the similar nature, the individuals involved (Frenzo, Nelson and Astronomo) and the time period.

mains a facilitator no matter how often he plays the role.

### C. *Criminal History*

The government seeks an upward departure from Criminal History Category I to III on several grounds: a) Astronomo's statements "describing his own ongoing criminal activities, most of them in furtherance of organized crime, over a period of years, including murders, violence, and threats of violence" and his enthusiastic efforts to assist in laundering; b) the observation of a police officer that he was carrying nunchaku sticks or "nunchuks", which are an illegal weapon.[24]

The Guidelines direct the Court to look to the formal record of conviction first, precisely so that judges do not try offenses long after memories dimmed, or are wrongly refreshed, after witnesses scatter and evidence degrades. *United States v. Footman*, 66 F.Supp.2d at 99. The court is supposed to review the defendant's record of convictions and the punishment he received, and determine the criminal history score. But recognizing that the formal scoring cannot be entirely adequate to the task, § 4A1.3 permits the court to depart where "reliable" information indicates that the formal score does not adequately reflect the defendant's culpability or the likelihood of recidivism.

Still, the Guidelines focus on the formal record: The policy statement in § 4A1.3 describes the kind of data that may be relevant to the court's determination of the "adequacy" of the criminal history category. Again, there is an emphasis on convictions, and the circumstances surrounding them—in effect, asking the question—what is it about the score which created the under (or over) valuation of the record?:

(i) prior sentences not counted in computing criminal history (e.g., foreign sentences), (ii) prior sentences of "substantially more than one year" that derive from independent crimes on different occasions, see § 4A1.3(a) and (b); (iii) the timing of convictions—did they follow closely one after another, or while another charge was pending, see U.S.S.G. § 4A1.3(d); and (iv) the nature of the convictions,—e.g., assaultive behavior or nonviolent conduct. *See Footman, supra* at 99.

In addition, the Guidelines permit the court to reexamine the sentences the defendant has already received. Commentary to U.S.S.G. § 4A1.3 suggests that a court may second guess the sentences imposed by other courts, i.e., "a defendant with an extensive record of serious, assaultive conduct who had received what might now be considered extremely lenient treatment in the past might have the same criminal history category as a defendant who had a record of less serious conduct."

■ Finally, the Guidelines permit a court to go beyond the formalities of convictions and sentences, with U.S.S.G. § 4A1.3(e) allowing it to consider "prior similar adult criminal conduct not resulting in a criminal conviction," so long as the information is "reliable." U.S.S.G. § 4A1.3, cmt.background. But, this is an avenue to be pursued with caution, as I noted in *Footman, supra:*

> To be sure, just because the Guidelines seem to give a judge the discretion to look to criminal conduct rather than convictions, it does not mean that a judge should do so. Once one ventures past formal convictions, and formal sentences, one is in troubling territory. How can the court reconstruct prosecu-

---

**24.** Nunchuks are made of two sticks of hardwood joined together at one end by a chain, leather or rope. These sticks are considered to be an illegal weapon under G.L.c. 269 § 10(b).

tions long past? Should the court essentially retry the past conduct, or rely on police reports which may well be skewed? And if a matter has been dismissed, or worse, resulted in an acquittal, how can the court, many years hence, substitute its judgment for that of the original decision-maker?

The government dramatizes all of the concerns I raised in *Footman* in the arguments it makes here.

First, Astronomo's formal record does not suggest *any* crimes. He scored in criminal history category I. He was charged with disorderly conduct in 1993 for which he received a continued without a finding, and then a dismissal. The government had the temerity to bring the arresting officer, Joseph Acosta, who charged disorderly conduct, to reconstruct what went on in 1993. He testified that Astronomo, ostensibly the bouncer of the club, was assaulting someone with nunchuks. Acosta did not charge that in 1993 because he had only observed a fight from a distance. A weapon was found but Acosta believed at the time that it could not be attributed to any one of the participants. Now, eight years later, he manages to do better—identifying Astronomo as the person with the nunchuks assaulting another.

I will not recast Astronomo's minor arrest into a more serious one for the purposes of an upward departure based on Officer Acosta's post hoc reconstruction.[25]

Second, the government would have me try not just similar adult criminal conduct, but wholly different conduct, and conduct never investigated, charged or remotely corroborated. to boot.

While § 4A1.3 is phrased broadly, in fact the cases in which upward departures

have been granted typically involve some sort of formal proceeding—a formal investigation by the police, a vacated sentence, or some official act that gives credence to the additional criminal conduct.

For example, in *United States v. Tabares*, 951 F.2d 405, 411 (1st Cir.1991), the defendant did not deny or contest any of the facts in the presentence report; thus, the court held, "There is no reason here ... to doubt that these acts occurred. The only legal question is whether or not they provide an adequate basis for increasing the criminal history category. In our view, given their serious nature, these acts do provide such a basis." *Id.* at 411. In *United States v. Ramirez*, 11 F.3d 10, 14 (1st Cir.1993), the defendant had the following on record as prior criminal conduct: "three charges of assault with a dangerous weapon (once a broom handle, once a BB gun, and once a handgun), the last of which is still pending; and one charge of driving to endanger, death resulting ... which is still pending." *Id.* at 12. Moreover, the First Circuit noted specifically in both cases that there were no defense objections to the presentence report. *Ramirez*, 11 F.3d at 14; *accord Tabares*, 951 F.2d at 411 ("In this case, as in *Tabares*, appellant received a full opportunity to object to these descriptions" and did not do so.).

Likewise, in *United States v. Diaz–Martinez*, 71 F.3d 946 (1st Cir.1995), and *United States v. Doe*, 18 F.3d 41 (1st Cir.1994), departures were also based on either uncounted previous convictions or previous charges that did not result in a conviction. In *Diaz–Martinez*, the First Circuit affirmed the district court's upward departure from CHC II to CHC IV where the

---

**25.** Nor do I credit Trooper Frenzo's general recollection that he has seen Astronomo with

nunchuks.

grounds for the departure were "(1) that the defendant had engaged in prior similar criminal conduct (including weapons offenses) that had not resulted in conviction; and (2) that the defendant, at the time he committed the federal offense, had been released on bail pending trial on charges filed in the local court, thus demonstrating a serious lack of respect for the judicial system and a high risk of recidivism. These are both encouraged grounds for upward departure." *Id.* at 952. In *Doe,* the defendant had a "virtually unbroken chain of assaultive behavior" as reflected in uncounted juvenile convictions or older convictions. *Id.* at 45. Additionally, when Doe was arrested, "he led the police on a high speed chase through city streets ... which ended when he crashed into other cars and a subway tunnel barrier. Endangering the lives of others in this way makes the instant case unusual, in principle permitting a departure." *Id.* at 48.

In *United States v. Brewster,* 127 F.3d 22, 26 (1st Cir.1997), the court upheld a criminal-history-based sentence upgrade for the defendant that was based on uncharged prior criminal conduct (domestic abuse) dissimilar from the crime of conviction. In this case, the district court did not depart based upon the domestic abuse alone; the judge also took into consideration seven prior convictions for serious crimes, as well as the defendant's refusal to participate in both an alcohol abuse program and a domestic violence counseling program. *Id.* at 25. The judge noted that the uncharged criminal conduct—domestic abuse—was corroborated by multiple sources, observing that "such independent corroboration is a prime indicator of reliability in the sentencing milieu." *Id.* at 28. Finally, the judge took into account the defendant's refusal to object to the government's accusations when given an opportunity to do so, observing that this conduct "can itself be viewed as an indici-

um of the proffered information's trustworthiness." *Id.* at 28.

However, the *Brewster* court added an admonition which I find telling:

[W]e should approach 'dissimilar conduct' departures, like all other departures, with great circumspection. Our holding will have force only in instances in which the uncharged, dissimilar conduct is so serious that, unless it is factored into the sentencing calculus, the resultant CHC will be manifestly deficient as a measure of the defendant's past criminality ... *Moreover, we anticipate that we will encounter relatively few defendants who have substantial records of serious, dissimilar criminal conduct that has never been brought to contemporaneous official attention.*

*Id.* at 27 n. 3 (emphasis added).

 Here, absolutely nothing is corroborated or even charged. The government did not try. There is no investigation; there are no independent accounts. Throughout the case, there are two explanations for Astronomo's words: They are either exaggerations to impress the listener, or they are true. I have no idea which it is. For example:

The defendant represented that he had done a "hit" with one Bobby Bolero. The victim was an accountant, who owed the "Family" money; they put his feet in buckets of cement and threw him into the water. The FBI never followed up: Was there a report of a missing accountant? Did any other informant speak about such an event? Who and where is Bobby Bolero?

Then Astronomo told Davis that a neighbor poisoned his German shepherd and that he shot up the neighbor's car in response. Was there any proof that Astronomo even had such a dog? Any similar incident reports in Somerville?

Or Astronomo said that if someone did not pay debts owed "Skinny" he would threaten them with ending up in the trunk of a car in Wonderland, or a dumpster. The defendants' words—which I both heard on tape and which were related to me through the agents' testimony—were surely menacing. While I agreed to continue Astronomo's detention before trial, based on those words, after hearing Astronomo over and over again on the tapes, I have come to a different conclusion.

Astronomo talked about a prostitution business in Everett, near Malden; no one investigated it. He indicated that he had guns and would get a gun for Frenzo. He never did. He was never even seen with guns. He talked about hiding assets, getting "clean" guns, etc. Yet again, it was not at all clear whether this rhetoric came from real experience, talk on the street, or the movies. He was described by Frenzo as an "expert in the martial arts," again without corroboration.

Finally, as part of the criminal history upward departure, the government would count the multiple money launderings to which they previously referred. The same concerns to which I have already alluded preclude counting those instances as prior criminal history.[26]

## D. *Summary*

Nothing in this memorandum should be interpreted as a determination that Astronomo *did not do* the acts alleged. I cannot say that. He may have been all that the government now portrays him to be.

But the government has the burden of proof and notwithstanding how limited that burden is—fair preponderance of the evidence—it was not met here. It was available to the government to make a better case—to investigate further if Astronomo was as bad as they now say he was, to charge for additional crimes, to seek additional confirmation of monies laundered. They chose not to do so. And in this second string fact-finding process, made even more "second string" by the evidence the government presented, I cannot make head or tail of what the facts are.

## SO ORDERED.

## AMENDED SENTENCING MEMORANDUM [1]

### TABLE OF CONTENTS

I. *BACKGROUND* .......................................................178

II. *THE INDICTMENT* ...............................................182
 A. *Before Judge Gertner* ...................................182
 B. *Before Judge Tauro* ....................................182

III. *THE BASIC GUIDELINE COMPUTATION* .................182

IV. *CONTESTED SENTENCING ISSUES* .....................183

---

**26.** In any case, the government cannot have it both ways—count the money launderings as additional relevant conduct and as a additional criminal history points.

**1.** On December 6, 2001, the government filed a Motion to Correct Errors in Findings in my Sentencing Memorandum issued November 26, 2001. Specifically, the government claims that certain conversations that I noted had not been recorded were in fact recorded, although not introduced in the record. I have changed this memorandum to reflect which conversations were recorded and I have listened to the tapes. My findings are unchanged.

A. *Amount Laundered—Issues of "Relevant Conduct"* .........................183
 1. Amounts Mentioned in the Ongoing Negotiations with *the Trans and Kenny, but Never Laundered* ...............................................183
 a. *June 10, 1997: Astronomo/Frenzo/Tran Conversation* ...............184
 b. *January 18, 1998: Nelson/Astronomo* .................................184
 c. *March 18, 1996: Davis/Astronomo/Kenny* ............................185
 2. Amounts Mentioned in Discussions with Other *Launderers* ..................185
 a. *Law of Attempts* .......................................................186
 b. *Law of Conspiracy* .....................................................188
 c. *The Specific Transactions* .............................................189
 (1) *January 20, 1996—James "Waxie" Schneider* .....................189
 (2) *January 20, 1996: Peter Ip* .....................................189
 (3) *March 1996: "Roger from Hong Kong"* ............................189
 (4) *Duany/Rae* ........................................................189
 (5) *"Skinny" Kazonis* .................................................190
 (6) *Miscellaneous Evidence* ...........................................190
B. *Role in the Offense* ...........................................................191
C. *Criminal History* .............................................................191
D. *Summary* .....................................................................192

GERTNER, District Judge.

The sentencing of Edwin Bacus Astronomo (hereinafter "Astronomo") raises a host of troubling issues. The facts the government seeks to establish concerning the criminal conduct of the defendant and his prior criminal history bear little relation to the allegations in the indictment, the facts to which the defendant pled guilty, or his actual criminal record.

The indictment charges Astronomo with conspiracy and attempted money laundering under 18 U.S.C. § 1956(h) and 18 U.S.C. § 1956(a)(3)(B) and (C). He introduced two undercover agents to the alleged launderers, Anna and Toan Tran (hereinafter "the Trans"), vouched for the agents on the one hand, and promoted the money launderers on the other. The amount alleged is $84,000. A related indictment before another Judge of this Court charges Astronomo with conspiracy and laundering money through Man Kin Chan (known as "Kenny"); the amount alleged is $20,000.[2] In addition, Astronomo, age 46, has no criminal record, just a single arrest for disorderly conduct, eight

years ago, which was continued without a finding and then dismissed.

But the government suggests that Astronomo is responsible for a much larger amount of laundered funds, more than double that for which he was indicted, that Astronomo is responsible for many crimes, wholly unrelated to the accusations in this case, and finally, that he was really a manager or organizer of an "otherwise extensive" crime scheme. They seek sentencing enhancements, in short, based on the amount laundered, his criminal history and his role in the offense.

## I. BACKGROUND

Before addressing these specific enhancements, I want to put this sentencing in context: It is not unusual for adversaries to draw different pictures of the case. What is unusual here is the distance between the two, and worse, how little is resolved by the defendant's guilty plea and the formal record.

The defendant paints the following picture: Born in the Philippines and now a

---

**2.** Astronomo pled guilty to conspiracy and money laundering in a case pending before the Honorable Joseph L. Tauro. (Dkt.# 00–10310–JLT). Sentencing in that case will follow the instant one.

naturalized citizen with nearly twenty years in this country, Astronomo scratched out a living as a maintenance man by day (at Quikcrete, a cement and concrete company), and as a doorman at a nude bar and later, at the counter of a "adult" book store in Boston's "Combat Zone" at night. He lived modestly, and received at best a few hundred dollars from his participation in the charged money laundering scheme. Apart from the disorderly conduct charge, he has never been arrested; he has had absolutely no contact with law enforcement authorities before this case and the one before Judge Tauro. He claims that these charges derive from his relationship with Roger Nelson, a man who helped him when he first arrived in Boston. When Nelson, who had a number of criminal contacts in the Combat Zone, became a cooperating witness for the government, he fed Astronomo names of money launderers and encouraged him to set up the deals to which Astronomo pled guilty. Nelson, the defense claims, used Astronomo to buttress his position with the federal authorities. Out of loyalty to Nelson, Astronomo agreed.

The government's picture could not be more different: Notwithstanding the allegations of this indictment, and the related one before Judge Tauro, Astronomo is an important player in a web of money laundering schemes, far beyond those to which he has pled guilty. He introduced the agents to perhaps twenty potential money launderers from 1995–1999; conversations "about" future money laundering followed with each of the alleged launderers. His role went beyond just introducing one to the other; he took part in discussions about money laundering, effectively facilitating their completion. Notwithstanding the absence of any criminal record, the government claims, Astronomo is closely connected to the Italian Mob, particularly, William "Skinny" Kazonis and has, quite literally, gotten away with murders and assaults.

By raising these issues at sentencing, the government bypasses the more stringent mechanisms of proof under the Constitution—indictment, trial—and chooses to litigate complex factual and legal issues in what one commentator described as a "second string fact finding process."[3] Not only were the accusations the government now makes not subject to any trial, the government did not bother to investigate many of them. Rather the government relies on the defendant's comments to undercover agents which it claims were accurate, but which the defendant calls "puffing." Did Astronomo really kill an accountant by drowning him in "cement shoes" or was he just trying to impress the agent? Was he an enforcer for the Mob, or just the counter man at a dirty book store?

In fact, the government was not after Astronomo at all. It was after William "Skinny" Kazonis, an alleged Mob figure, who Nelson suggested the government could "get" through Astronomo. But while Astronomo "puffed" about his close ties to Kazonis, in four years he was unable to effect any transactions with him. Proceeding only against Astronomo and the actual money launderers, the Trans, in the case before me, and against Kenny, in the case before Judge Tauro, the government had two major witnesses.[4] It called

**3.** Gerard E. Lynch, *The Sentencing Guidelines as a Not–So–Model Penal Code,* 10 Fed. Sent. Rep. 25 (July/August 1997).

**4.** In addition the government called Jose Acosta, a Boston police officer who arrested Astronomo for disorderly conduct in 1993. *See* Section IV, *infra.*

an FBI undercover agent based in San Diego, Mark Davis [hereinafter "Davis"], who had contacts with Astronomo between 1995 and 1997, when the FBI discontinued its investigation. In addition, the government called a state trooper, Mark Frenzo [hereinafter "Frenzo"], who met with Astronomo between 1997 and 1999, when he was working with U.S. Customs authorities. The Customs authorities were ostensibly taking up where the FBI left off.

What is curious about these witnesses is that neither man was involved in the ongoing and rather elaborate investigations of the Boston Mob taking place at or near the same time.[5] Indeed, neither had any up to date information about who was who in the Boston Mob, who was under investigation and who was not. As a result, neither could corroborate the bona fides of Astronomo's Mob references and supposed Mob ties. While there may have been other cooperating witnesses or agents who were more "in the know," none were called.

Roger Nelson, Astronomo's friend, who introduced him to Davis and then Trooper Frenzo, could not be called as a witness. He had died in September of 1998. Even if he had lived, however, it is not at all clear whether he would have been a government witness. By the time of this proceeding, Nelson had been thoroughly discredited, at least in the eyes of Davis. He had e-mailed a number of law enforcement authorities expressing his unhappiness with the way the FBI was handling the

case, trying to "sell" his services to others. Some of the statements made in that e-mail, about pending investigations, and specifically about Astronomo, were conceded by the FBI to be wholly false. Indeed, on February 3, 1997, labeling his conduct "egregious," Davis recommended to his superiors that Nelson no longer serve as a cooperating witness. Significantly, however, Nelson continued to work for Trooper Frenzo after that date.

Ideally, trials or pleas, with due process safeguards, will resolve most factual issues. At a trial, the government's proof is tested before a jury and with the highest evidentiary standard, beyond a reasonable doubt. In a plea, when the defendant expressly waives those formalities, essential factual questions are generally put to rest in the plea colloquy. Sentencing, with more perfunctory procedures, arguably should resolve the more typical sentencing issues, like the defendant's background or the significance of his formal criminal record. Not so here. Instead, I was asked to try other very serious crimes—money laundering with other suspects, murders and assaults—crimes that were not investigated, confirmed or corroborated.

Pre-Guidelines there would have been nothing troubling about the government's approach. Prior to the passage of the Sentencing Reform Act,[6] prosecutors and/or probation officers would seek to introduce evidence about other crimes, re-

5. The government cited to published cases to dramatize Kazonis' role as an associate of Gennaro Angiulo, an "underboss" of the Patriarca organized crime family. *United States v. Angiulo,* 847 F.2d 956, 960–62, 969–70, 973–74 and n. 23 (1st Cir.1988); *United States v. Cintolo,* 818 F.2d 980, 986–88 (1st Cir. 1987); and, *United States v. Kazonis,* 530 F.2d 962 (table). The cases point to Kazonis' activities some ten years before Astronomo's activities. No witness testified to what, if

anything, Kazonis was doing after his release from imprisonment. More recent cases, notably, *United States v. Flemmi,* 225 F.3d 78 (1st Cir.2000) suggest that the FBI had great success in infiltrating the Boston Mob and had considerable reliable information about its activities. The contrast with the information presented to me at sentencing is striking.

6. Pub.L. No. 98–473, 98 Stat. 1837 (1987).

lated and unrelated, often uncorroborated.[7] The judge had discretion to give such "facts" whatever weight the court believed to be appropriate. With the Guidelines, however, accusations, if found true by a preponderance of the evidence, often have specific, and sometimes onerous, consequences. For example, this defendant's sentence will be substantially affected by a finding that $200,000 or more, has been laundered, or a finding that his criminal history Category should be Category III, not Category I.

In short, sentencing has profoundly changed. The issue is not whether Astronomo was involved in laundering "more" than the indictment alleges. The issue is: How much more? It cannot be that both of the following statements are true: When a judge finds a specific fact—the precise amount of money laundered—he or she has "no choice" but to impose the Guideline consequences, a higher score, and often a higher sentence. *And* when a judge *cannot* find a specific fact—just the "sense" that there may be more here than meets the eye—he or she *also* has no choice but to impose the higher score and the higher sentence. The Guidelines are precise; I will enforce them precisely.

One further note: The defendant claims a violation of *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). There is none. The Court's for-

mal holding was that "any fact (other than a prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury and proved beyond a reasonable doubt." 530 U.S. at 473–74, 120 S.Ct. 2348. The "enhancements" the government seeks here do not take the defendant's sentence beyond the range established by defendant's guilty plea. But dicta in the majority and the concurrences suggests wider concerns which *are* dramatized by this case—that more and more issues of consequence, issues that could directly impact on the defendant's liberty are being litigated at sentencing, rather than at jury trials. *See e.g. United States v. Wilkes*, 130 F.Supp.2d 222, 231–32 (D.Mass.2001) (describing *Apprendi*'s three tests—legislative, traditional, and impact).[8]

I appreciate the government's work; there may well be good and sufficient reasons for proceeding in this fashion. But the fact remains that after three days of testimony, myriad tapes and videotapes (which I have played and replayed), arguments of counsel, I cannot conclude, by a fair preponderance of the evidence, that the government's version of Astronomo's acts and background is the correct one. It may well be; I simply have no idea what was "really" going on, surely not enough to justify imposing the enhanced sentence the government seeks.

---

7. *Williams v. New York*, 337 U.S. 241, 248, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949), was the classic example. A jury, after convicting the defendant of first degree murder, recommended life imprisonment. The judge disagreed and sentenced the defendant to death. While Williams had no criminal record, the judge relied on the presentence report, which contained information inadmissible at trial, and concluded that defendant had in fact committed a string of uncharged burglaries and had a "morbid sexuality." *Id.* at 244, 69 S.Ct. 1079.

8. Justice Stevens notes:

> ... As a matter of simple justice, it seems obvious that the procedural safeguards designed to protect Apprendi from unwarranted pains should apply equally to the two acts that New Jersey has singled out for punishment. Merely using the label 'sentence enhancement' to describe the latter surely does not provide a principled basis for treating them differently.

*Id.* at 476, 120 S.Ct. 2348.

## II. *THE INDICTMENT*

### A. *Before Judge Gertner*

On August 24, 2000, Astronomo was indicted by a federal grand jury on one count of a money laundering conspiracy in violation of 18 U.S.C. § 1956(h) and 18 U.S.C. § 2 and one count of attempted money laundering in violation of 18 U.S.C. §§ 1956(a)(3)(B) and (c) and 18 U.S.C. § 2. The indictment alleges that Astronomo "promoted" his codefendants, Anna Tran and Toan Tran,[9] as "money launderers" to potential customers, and that he introduced such customers to the Trans.

Four specific transactions are alleged: 1) On September 4, 1997, the Tran's were alleged to have laundered $18,000 in cash by a customer named "Louie" (who was the undercover agent Frenzo), which Louie represented to have been drug proceeds; 2) on October 9, 1997, another $20,000; 3) February 20, 1998, another $15,000; 4) on March 4, 1999, Louie gave Astronomo $31,000, which the Trans declined to launder because it was "too hot."[10] The total amount laundered or attempted to be laundered, according to the indictment, was $84,000.

### B. *Before Judge Tauro*

In addition, Astronomo pled guilty to a separate money laundering conspiracy and substantive acts, conducted with a different launderer, Man Kin Chan (also known as "Kenny").[11] The amount involved in the second indictment is $20,000 (arising out of a transaction on May 11, 1999).

## III. *THE BASIC GUIDELINE COMPUTATION*

Astronomo has no criminal record. Seven years ago he was arrested for being a "disorderly person"; the charges were continued without a finding and then dismissed. If I simply sentenced on the basis of the amounts to which the defendant pled, and his criminal history, the Guideline computation would be as follows: a) Base offense of 20 (under U.S.S.G. § 2S1.1 (2001));[12] b) with the amount exceeding $100,000 but less that $200,000, add 1 (under U.S.S.G. § 2S1.1(b)(2)(c)); c) since the defendant was told by the undercover agents that the funds were drug proceeds, add 3 (under U.S.S.G. § 2S1.1(b)(1)); d) since the defendant pled guilty, deduct 3 for acceptance of responsibility (under U.S.S.G. § 3E1.1), for a total of 21, and a Guideline range of 37–46 months.

The government argues that notwithstanding the allegations in the indictment, Astronomo is responsible for much, much more money laundering as "relevant conduct" (under U.S.S.G. § 1B1.3), surely over $200,000, adding two points and not one (under U.S.S.G. § 2S1.1(b)(2)(c)). Moreover, although he is charged as someone who simply "promoted" the Trans and Kenny as money launderers to the two undercover agents, in fact he is an "organizer" or "manager," and should get an enhancement of 4 points (under U.S.S.G. § 3B1.1(a)). Finally, the government claims that even though Astronomo has no record, his non-existent criminal history score under-represents his culpability. He has, according to the government, literally

---

**9.** Anna Tran and Toan Tran have also pled guilty, but have not yet been sentenced.

**10.** This $31,000 is the subject of the "attempted money laundering" charge in Count 5. The others are subsumed in Count 1, the conspiracy count.

**11.** Chan has been sentenced to 33 months incarceration with two years of supervised release.

**12.** The Guideline version used throughout this opinion is the 2001 edition.

gotten away with murders and beatings, uncharged, uncorroborated, indeed uninvestigated. The government argues for a criminal history score of III. If I accepted the government's arguments, Astronomo's Guideline range would be doubled, 78 to 97 months.

I rejected the government's enhancement arguments for the reasons described below. But while I could not make findings with the precision required by the Guidelines, I heard enough to sentence Mr. Astronomo to the high end of the applicable range, 46 months.

## IV. CONTESTED SENTENCING ISSUES

### A. Amount Laundered—Issues of "Relevant Conduct"

In money laundering, as with many other offenses, the amount of money laundered is a proxy for the defendant's culpability; the more he or she launders, the more punishment he or she arguably deserves.[13] See U.S.S.G. § 2S1.1(b)(2). Each increment adds a point to the base offense level; the higher the base offense level, the higher the sentence. The government argues that the relevant conduct for Astronomo must take into account his "extensive and continuous criminal efforts, over a four year period, to launder the purported drug money of two successive undercover agents."

Specifically, the government would include not only (a) the amounts that actually changed hands in the Tran and Kenny laundering scheme, but also (b) the amounts that were mentioned in negotia-

tions between Astronomo, the undercover agents, and the Trans and/or Kenny but never sought by the government for laundering; (c) amounts mentioned in conversations with other launderers to whom Astronomo had introduced the agents, which amounts were never actually laundered.

There is no contest as to category (a), the money that actually changed hands in the Tran and Kenny laundering schemes. Indeed, although the amounts mentioned in the two indictments total $104,000, both parties concede that Astronomo should be held responsible for $134,000, which included an attempt to launder proceeds with Kenny for which Astronomo was responsible.[14]

There is substantial contest as to the category (b) amounts mentioned in the ongoing negotiations with the Trans and Kenny but never laundered and category (c) amounts mentioned in conversations with other money launderers, but never laundered.

### 1. Amounts Mentioned in the Ongoing Negotiations with the Trans and Kenny, but Never Laundered

A defendant is held responsible for his own acts under U.S.S.G. § 1B1.3(a)(1)(A)—acts committed, aided, abetted or willfully caused by him as well as attempted criminal acts. See id. Cmt. n.7. In addition, a defendant is held responsible for the acts of others: U.S.S.G. § 1B1.3(a)(1)(B) provides that a "jointly undertaken criminal activity" is a "criminal plan, scheme, endeavor, or enterprise, un-

---

**13.** Another factor is whether the defendant believed that the funds were the proceeds of illegal drug distribution, which is conceded here. See U.S.S.G. § 2S1.1(b)(1). The agents took pains to tell the defendants that money represented drug proceeds.

**14.** This includes Tran laundering on September 4, 1997 ($18,000), October 9, 1997, ($20,000); February 20, 1998 ($15,000); March 4, 1999, (attempted laundering of $31,000), the Kenny laundering on May 11, 1999 ($20,000), and an attempted laundering on June 19, 1999 ($30,000).

dertaken by the defendant in concert with others, whether or not charged as a conspiracy." Further, note 2 proves that a defendant "is accountable for the conduct (acts and omissions) of others that was both: (i) in furtherance of the jointly undertaken criminal activity; and (ii) reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). cmt. n. 2.

Applying these Guidelines, I decline to "count" as relevant conduct the amounts mentioned in general conversations with the Trans and Kenny for several reasons: The participants spoke in broad terms at the outset of their dealings, and from time to time during the course of their relationship. Their comments about laundering money were mixed with bragging about their various activities, obviously to get the agents' business or to keep it. And although it is not the only relevant evidence—the words used, the tone of voice of the participants, and the surrounding circumstances are also to be considered—one important indication of the scope of the agreement with the codefendants was what was actually laundered thereafter.

### a. *June 10, 1997: Astronomo/Frenzo/Tran Conversation*

On June 10, 1997, Astronomo took Frenzo to meet the Trans, for the first time.[15] Frenzo said that "I'd be laundering in excess of $50,000 to $100,000." Anna Tran, according to Frenzo, said "that wasn't that much." In addition, they spoke about what the Trans' fee would be, namely 15%. Astronomo was present throughout. Frenzo did not say during what period of time this laundering would

take place, or whether the amount mentioned was the total amount, or periodic installments. There was no mention of when the arrangements would be made and by whom. In any event, notwithstanding Frenzo's grandiose statement, and Anna Tran's grandiose answer, the first time that Frenzo laundered money with Tran was several months later, on September 4, 1997, and then for "only" $18,000. A month later, on October 9, 1997, an additional $20,000 was laundered through the Trans. The arrangements, in short, were ad hoc, depending upon the amounts Frenzo had, whether the Trans were ready. I will count the $18,000 and the $20,000. I will not count the $50,000 to $100,000 figure mentioned in the preliminary negotiations.

### b. *January 18, 1998: Nelson/Astronomo*

Three months later, on January 18, 1998, Nelson reported to Astronomo that he and Frenzo had "maybe forty. Thirty, forty" thousand dollars. He added, "And then ah ... I'm just going to keep it going, keep the door open." And he added, "yeah because ah, maybe I'm gonna have um ... seventy-five to a hundred." Nelson reported to Frenzo that Astronomo had conveyed this information to the Trans. Again, the Nelson–Astronomo conversation could not have been more general or more speculative. In any case, no such amounts were transacted. In fact, a month later, on February 20, 1998, Frenzo and Nelson placed $15,000 with the Trans. (While Astronomo did not directly participate in the February 20, 1998, transaction, it is conceded that he is to be held respon-

---

**15.** In the first memorandum issued by this Court on November 26, 2001, I indicated that this conversation was not recorded. The government, in a subsequent Motion to Correct Errors in Findings indicated that the tape had been produced to the defendant but had not been played at the sentencing hearing because there was no contest with respect to the statements contained therein.

sible because of his work in the initial stages.)

By April, the Frenzo–Tran connection was fraying. Frenzo complained about the Trans to Astronomo. Their commission was too high; one of the checks given to Frenzo for his cash bounced. Over a year later, on March 4, 1999, when Frenzo told Astronomo that he had another $31,000 for the Trans, they refused to handle it.[16] I will count only the February 20 transaction for $15,000 and the March 4 transaction for $31,000.

### c. *March 18, 1996: Davis/Astronomo/Kenny*

A similar pattern was followed with Kenny. On March 18, 1996, Agent Davis, accompanied by Astronomo, met with Kenny, and mentioned the need to launder $20,000–$30,000, or even more. No such amounts were laundered. It was not until over three years later, on May 12, 1999, that Trooper Frenzo, taking over from Agent Davis, placed $20,000 with Kenny. Within a month, on June 16, 1999, Frenzo tried and failed to place an additional $30,000 with Kenny (the attempted laundering already included in the amounts described above). Again, I will only count the $20,000 laundered on May 12, and the $30,000 which was supposed to have been laundered on June 16, 1999.

### 2. *Amounts Mentioned in Discussions with Other Launderers*

In addition to the amounts alleged in the Tran and Kenny conspiracies, the government alleges that I should include "the additional amounts involved in some, although far from all, of the occasions when

Astronomo willingly associated himself with plans to launder other amounts of the agents' purported drug money between 1996 and 1999, and explicitly or implicitly agreed to assist the agents and coconspirators whom Astronomo had solicited and recruited in carrying out those plans."

The analysis here is complicated for several reasons. First, the amounts to which the government refers were mentioned in general conversations, like those described above—speculative, puffing at times, vague. Second, with a few exceptions, these were not recorded conversations; what was said was characterized by the agents involved. I was not able to hear the voices of the participants or the details of their negotiations which I must do in order to make the findings required of me. Finally, the amounts the government would have me credit as relevant conduct were discussed generally, but in fact, never laundered. Indeed, there is no evidence that the agents placed any money with the potential launderers thereafter, or even monitored whether any one else had placed money with them.

While I understand that the Guidelines require me to consider as "relevant conduct" not just the amount actually laundered, but the amount that the parties intended to launder, *United States v. Graciani,* 61 F.3d 70, 74 (1st Cir.1995); *United States v. Tejada–Beltran,* 50 F.3d 105, 110 (1st Cir.1995), in making that determination I should not jettison the common law standards for criminal liability.

My starting point must be the substantive law of attempt and the substantive law of conspiracy, unless the Guidelines have expressly modified these standards.[17]

---

16. Nevertheless, I count this episode as an attempted laundering. Astronomo took the money and contacted the Trans.

17. It should be noted that § 1B1.3 indicates "the principles and limits of sentencing accountability under this guideline are not always the same as the principles and limits of criminal liability." U.S.S.G. § 1B1.3, Cmt.

Based on that law, I conclude that the conversations with potential money launderers do not amount to relevant conduct under § 1B1.3(a)(1)(A) or (B) since no crime was either attempted or agreed to.

### a. Law of Attempts

The substantive law of attempts does not criminalize bad intentions or bad thoughts. The rules should be no different at sentencing. As LaFave and Scott have noted:

> The crime of attempt, ... consists of: (1) an intent to do an act or to bring about certain consequences which would in law amount to a crime; and (2) an act in furtherance of that intent which, as it is most commonly put, goes beyond mere preparation.

LaFave and Scott, Substantive Criminal Law, § 6.2 (1986). *See also, United States v. Doyon*, 194 F.3d 207, 210 (1st Cir.1999) (observing that there are two elements to attempt: (1) an "intent" to commit the substantive offense and (2) a substantial step towards its commission).

The government argues that there need not be any actual laundering for there to be an agreement to do so chargeable to the defendant, pointing to a line of cases which suggest that no overt act is required for a money laundering conspiracy under 18 U.S.C. § 1956(h). *E.g., United States v. Tam*, 240 F.3d 797, 802 (9th Cir.2001).

But the government confuses the law of attempts and the law of conspiracy. While there is no overt act requirement for conspiracy to launder under 18 U.S.C.

§ 1956(h), for attempted laundering under 18 U.S.C. § 1956(a)(3)(B) there must be a "substantial step" towards the completion of the crime.

In *Tam* the court used the Supreme Court's analysis in *United States v. Shabani*, 513 U.S. 10, 115 S.Ct. 382, 130 L.Ed.2d 225 (1994) as a template. Beginning its analysis precisely where I began mine in the instant case, the Supreme Court notes: "[A]bsent contrary indications, Congress intends to adopt the common law definition of statutory terms." 513 U.S. at 13, 115 S.Ct. 382. Common law conspiracy did not require an overt act in furtherance of it. When Congress enacted 21 U.S. § 846, it followed suit; the statute did not require, as did the general conspiracy statute, 18 U.S.C. § 371, that a conspirator "do any act to effect the object of the conspiracy." Applying the same analysis to § 1956(h), the *Tam* panel concluded that there was no overt act requirement for conspiracy to launder money.

As to attempted crimes, however, the common law rules are different. As LaFave and Scott note, "criminal attempts require proof of an intent to bring about the consequences set forth in the crime attempted, and this is so even though no such intent is required for the completed crime". *Id.* at § 3.5. Likewise, with respect to the act, "[a] substantial step is less than what is necessary to complete the substantive crime, but more than mere preparation." *United States v. Rodriguez,*

---

n.7. This reference, however, underscores the fact that sentencing standards in this section are more rigorous than the usual conspiracy standards. A defendant may not be held responsible at sentencing for the acts of coconspirators when he did not foresee them or expressly agree to them. He may be responsible as a matter of substantive conspiracy law but not as a matter of sentencing law.

In contrast, the notes accompanying § 1B1.3 recognize the distinction between the completed crime and the "attempted" crime, even at sentencing, and define "attempts" in keeping with the traditional, substantive law definition. *See* U.S.S.G. § 1B1.3, Cmt. n.7., § 2X1.1.

215 F.3d 110, 116 (1st Cir.2000).[18] The defendant's actions have to go beyond preparation and "corroborate strongly the firmness of the defendant's criminal intent." *United States v. Nelson*, 66 F.3d 1036, 1041 (9th Cir.1995). Put otherwise, the evidence must show that the crime "will take place unless interrupted by independent circumstances." *Id.* at 1042.

The facts of *Nelson* are instructive. The defendant was convicted of attempting and conspiring to structure a money laundering transaction. Undercover agents, posing as drug dealers, came to the car dealership where Nelson worked, proposing to buy a car with cash. Nelson and his codefendant suggested ways to structure the cash purchase of a car to avoid the reporting requirement. Nelson proposed that the agents buy a car under an assumed name; the supervisor of the two men rejected the proposal. Nelson proposed a trade-in scheme, involving used cars, to keep the purchase price under $10,000, and therefore not subject to reporting; the agents said they would "think it over." Then, when the deal could not be done at the dealership where Nelson and his code-

fendant worked, the codefendant referred the agents to another dealership, which he had called in advance, to "make the paper work right." The Ninth Circuit affirmed Nelson's conspiracy conviction, but reversed the attempted laundering.

The Court found that while Nelson plainly intended to structure the transaction, he did not take a "substantial step" towards the completion of the crime to qualify for an attempt. He did not break up a cash payment already received, *United States v. McLamb*, 985 F.2d 1284, 1286 (4th Cir.1993),[19] accept a cash payment, *United States v. Loehr*, 966 F.2d 201, 202–3 (6th Cir.), *cert. denied*, 506 U.S. 1020, 113 S.Ct. 655, 121 L.Ed.2d 582 (1992)[20], or prepare a detailed plan and receive payment, *United States v. Fuller*, 974 F.2d 1474, 1481 (5th Cir.1992).[21] Rather, he was doing what his job suggested, keeping customers on the hook while his superiors finalized the offer—in short, mere preparation. His actions were too "tentative and unfocussed" to be an "appreciable fragment of the crime of avoiding a reporting requirement." *Id.* at 1043. To qualify for an attempted structuring, Nelson must

---

18. U.S.S.G. § 2X1.1 mirrors these concerns. Guideline commentary cautions that in applying the Guidelines to attempted offenses only "specific offense characteristics" that are "determined to have been specifically intended or actually occurred" should count, and not "[s]peculative specific offense characteristics." Here, I find that the amounts mentioned in the meetings of the agents and potential money launderers comprise a "speculative specific offense characteristic[s]."

19. McLamb, who owned the car dealership, told the salesman to break up a $14,000 cash payments into two payments under $10,000, assisted in the transaction, and did not file a reporting form. He also advised an undercover agent in another transaction that there were ways to avoid reporting a cash payment of the car, advised him to break up the payment so each transaction would be under

$10,000, and discussed the deal when the agent arrived with the money. *Id.* at 1286–87.

20. In *Loehr*, the Sixth Circuit found a substantial step when a car sale designed to conceal drug proceeds through the use of an assumed name and the avoidance of the reporting requirement was at least half completed.

21. In *Fuller*, the Fifth Circuit found sufficient evidence that the defendant took a substantial step towards circumventing the currency reporting requirements, when he prepared a plan, refined it after communicating with the intended recipient of the money, demonstrated the commercial reasonableness of the plan to the government agent, received the money, and was on his way to deliver the money to the "sanitizing agent" when he was arrested.

have done more than merely discuss the possible ways to avoid the reporting requirements.[22]

### b. *Law of Conspiracy*

Nor do the general conversations about future money laundering with potential launderers qualify as acts in furtherance of a conspiracy to launder these amounts under § 1B1.3. The conversations do not necessarily suggest a real *agreement* at all, rather than a general "feeling out" of a potential launderer. Since there was nothing but the most general conversations about laundering money, at some point in the future, for a range of amounts, there is no "jointly undertaken criminal activity."

This was, after all, a government sting. As I have noted, the government chose not to place money with these "other" launderers. Nor did it have information that anyone else laundered money with them. Talking about laundering is hardly enough. The transcripts, after all, are filled with harebrained schemes and overblown ideas. I cannot say what was real and what was an embellishment.

The centerpiece of many of these conversations and perhaps the greatest "puffer" of all, was Roger Nelson, the cooperating witness who set up Davis and then Frenzo with Astronomo. As noted above, in 1997, in the middle of the Customs investigation with Trooper Frenzo, Nelson contacted other law enforcement agencies in order to "sell" his services. See Exhibits 18 and 19 (Report dated February 3, 1997). Nelson then sent an e-mail to a law enforcement official, with a nine page synopsis including purported details of the Boston investigation. Davis reported that it was "rife with fabrication and recollection of events which never occurred," "misinformation, speculation and inaccuracies." Nelson conceded to Davis that he "padded" the information in the e-mail to bolster his position with other law enforcement agencies, behavior which Davis found to be "egregious."

Nelson's impact in orchestrating meetings with other money launderers in Boston is hard to ascertain. The defense suggested that Nelson manipulated Astronomo into making the contacts. Telling Astronomo to set up meetings with × or y money launderer would enhance his status with the government. Astronomo, out of loyalty to Nelson who had helped him when he came to this country, did so. Agent Davis agreed that "every single person [Astronomo] introduced Davis to was someone that Roger Nelson knew." Moreover, Davis agreed that until the 1997 e-mail, Nelson was in regular contact with Astronomo, with some conversations taped, others not. On one tape, Nelson talked to Astronomo about not "putting all his eggs in one basket" and suggested other money launderers to solicit in order to satisfy the agents.

Significantly, even after Davis had recommended terminating Nelson's services as a cooperating witness for the FBI for his "egregious" conduct and misrepresentations, Trooper Frenzo, acting for U.S. Customs, continued to use him and credit his information. Apart from Nelson, the

---

**22.** As with Astronomo, Nelson's proposals, the court concluded, were just talk. Significantly, the Court affirmed the conspiracy charge, noting to the differences between attempt and conspiracy law. Rendering its decision prior to the Ninth Circuit's decision in *Tam* and the Supreme Court's decision in *Shabani*, the panel concluded that an overt act was necessary for conspiracy to launder, but distinguished the overt act required for conspiracy, from that required for attempt: "[T]he overt act required as an element need not have as immediate a connection to the intended crime as the 'substantial step' required for an attempt." 66 F.3d at 1044 (citing to *Harper*, 33 F.3d at 1148.).

agents themselves engaged in padding their criminal exploits and the scope of their activities. Exaggeration, puffing, embellishing, in short, were par for the course.

### c. The Specific Transactions

For example, the government would have me "count" the following as relevant conduct: [23]

#### (1) January 20, 1996—James "Waxie" Schneider

On January 20, 1996, Astronomo introduced or promoted Trooper Frenzo to nine others, including James "Waxie" Schneider. Davis talked to Schneider, in Astronomo's presence, about laundering $20,000 to $25,000 every two weeks. Since Davis testified generally about this encounter, I cannot judge whether it was a real attempt at money laundering or just idle chatter.

#### (2) January 20, 1996: Peter Ip

Apparently on the same day, Peter Ip was introduced to Davis by Astronomo. The government represented that Ip discussed several money laundering options, including $20,000 to $25,000 per week. There was no indication whether Astronomo was present during the discussions, whether specific details were discussed. No money was placed.

#### (3) March 1996: "Roger from Hong Kong"

"Roger from Hong Kong" was the most troubling testimony of all. Astronomo introduced Davis to "Roger" who represented that he would run money through the casino in Hong Kong, that Astronomo, Roger and Davis could go over to Hong Kong and see the operation themselves.

Seeking more details, the prosecutor asked, "What did you observe about this Roger?" Agent Davis' testimony could not have been more vague, speculative or, for that matter, inappropriate:

> My impression from what I observed of Roger was that he was—his body language was such that he seemed to be what I gathered, you know, a top end organized crime or a criminal, at least, his language and the way he conducted himself, how he behaved towards me, to me was indicative from my experience, of being, you know, top level criminal in whatever word he was dealing in.

It is hard to imagine how these observations pass as evidence even in a sentencing proceeding.

#### (4) Duany/Rae

But the plan that appeared on the surface to be the most specific was the one with William Billy Rae and Louis Duany. Astronomo sent Davis a business plan concerning a new seafood business, which he said would launder an "indefinite amount of money." It was a standard business plan, describing what the business would do and what equipment it needed. The business would involve the storage and shipping of fresh seafood; it would be a cash business through which money could be laundered. Astronomo, Davis, Rae and Duany met to discuss it; the government videotaped the encounter.

I reviewed the videotape several times. Astronomo hardly said anything at all. The "plan" was nothing more than a glimmer in the eyes of Duany and Rae. They had no money—no trucks, no supplies, no warehouses, no employees. They "needed an influx of cash to get this thing started," perhaps over six months. "And then this

---

**23.** I use these as examples only. In fact, I have reviewed each and every transaction with potential launderers which the government cited or which was in the record.

could be done like every year. This is not, you know, this could be an ongoing thing because if you need a company ..," they reported, and Davis added, "as long as the company exists." The plans were entirely unformed; "[I]t depends upon how you wanna work it, you know ..." they noted. And it was farfetched; the FBI never followed it up.

### (5) "Skinny" Kazonis

The most significant potential launderer of all was supposed to be "Skinny" Kazonis. Astronomo knew Kazonis. He worked at the counter at Kazonis' store, the Downtown Bookstore. Kazonis was introduced to Davis at a party in Astronomo's home in 1996, but the FBI investigation ended in 1996 without any money being placed with Kazonis.

Trooper Frenzo pressed on, after the FBI investigation was discontinued. Astronomo was still unable to launder any money with Kazonis, notwithstanding the exhortations of Frenzo and Roger Nelson. Frenzo characterized Astronomo's comments in a meeting that took place on April 18 or 19, 1998.[24] Astronomo indicated that Kazonis would launder drug money if the figure was large, i.e. $50,000. Frenzo reported that he would have $50,000 to $75,000 to launder "in the near future."

Then Nelson and Frenzo "advised Astronomo that if he was not comfortable with approaching his boss, then he shouldn't on our behalf". While Astronomo said that he was comfortable approaching his boss, again nothing came of it.

On October 7, 1998.[25] Frenzo tried again. He reported that he had $50,000 to be laundered and that he would pay $5,000 for commission. Astronomo represented that he would present the offer to the "Old Man" (ostensibly referring to Kazonis) the next day. They arranged to meet. The following day Astronomo cancelled the meeting because he had been unable to meet with Kazonis, and suggested another launderer, Henry Chow. Then Astronomo reported that he had spoken to Chow, and everything was "all set." Again the contact failed; Astronomo admitted that he had not contacted Chow. Several days passed; after Astronomo finally set up a meeting, Chow did not appear. The transaction was never pursued.[26]

### (6) Miscellaneous Evidence

The defense claims that nothing about Astronomo's life or lifestyle suggests laundering activities at the level the government alleges. He received $300 from Davis for all his work, and perhaps $200 from Frenzo (who suggested it would be

---

24. Again, in their Motion to Correct Errors in Findings the government noted that this conversation was recorded, the tape turned over to the defendant, but not made part of the sentencing hearing.

25. This conversation was recorded but not produced at the sentencing hearing.

26. Contrast these vague discussions with the attempted money laundering I have "counted" in the Kenny conspiracy. On June 19, 1999, Trooper Frenzo contacted Astronomo and indicated that he wanted to launder money through Kenny. Astronomo told him that Kenny might not be ready; Frenzo nevertheless drove to Downtown Books with $32,000

in cash and suggested laundering the money through another, Kevin Huynh. When Frenzo pressed, saying that he could not wait because he had other things to attend to, Astronomo suggested that Frenzo leave the money with him overnight, that Astronomo would try to place it with someone if he could, and return it if he could not. Astronomo called Kenny on Frenzo's cell phone and specifically tried to make arrangements for Kenny to get the money that evening. Those arrangements were unavailing. Frenzo declined the offer to use another launderer, Kevin Huynh. Laundering was plainly attempted.

money for drinks). Even in the seafood business plan, he was supposed to get a small share of the company but mainly work for a salary; those involved in the laundering would presumably get a commission for each amount laundered. While Astronomo represented to Davis and Frenzo that he had substantial assets, and that houses were put in the name of his mother and his girlfriend to escape government scrutiny, there was no proof. His home was modest; he drove an old car. He had two jobs—maintenance man by day at Quickcrete cement, counterman at the adult bookstore, by night.

Astronomo may well have laundered more money than the transactions specifically described above with the Trans and with Kenny. There is surely an aroma of "more," but that is not enough. As I noted, the Guidelines require me to say "how much more," and here the record fails. I have no idea.[27]

### B. *Role in the Offense*

The government argues that Astronomo was the "organizer" of an "otherwise extensive" criminal organization warranting a four level upward adjustment pursuant to U.S.S.G. § 3B1.1(a). And even if the organization was not "otherwise extensive," and Astronomo was "only" a manager, his role warrants at least a two level increase.

Section 3B1.1(a) adjustments reflect concerns that larger organizations are more dangerous than smaller ones and that those in positions of leadership within them are more culpable. Guidelines Commentary notes, "persons who exercise a supervisory or managerial role in the commission of the offense tend to profit more

from it and present a greater danger to the public and/or are more likely to recidivate." U.S.S.G. § 3B1.1; Cmt. background. *See, United States v. Footman,* 66 F.Supp.2d 83, 93 (D.Mass.1999), aff'd. *United States v. Footman,* 215 F.3d 145 (1st Cir.2000) (discussing the meaning of "otherwise extensive"). Typically, as the commentary indicates, leaders exercise decision making authority, recruit accomplices, claim a "larger share" of the fruits of the crime, and play an important role in planning and exercise control over others. U.S.S.G. § 3B1.1. cmt. 4.

The government's own description of Astronomo's role in the indictment belies the "leader" characterization. He "initiated contact on behalf of potential money laundering customers with the Trans, vouched for the customers to the Trans, obtained laundering rate information from the Trans on behalf of such customers and passed it along to the customers, arranged for customers to meet with the Trans, personally participated in meetings of customers with the Trans where money laundering was discussed." But he exercised no dominance or power over others; his share of the proceeds was minuscule; the terms of the transaction were set by others over whom he exercised no control.

As I noted, even if Astronomo laundered money multiple times, his role in each transaction remained the same. Just as a courier in a drug transaction remains a courier no matter how many trips she has taken, so a facilitator, like Astronomo, remains a facilitator no matter how often he plays the role.

### C. *Criminal History*

The government seeks an upward departure from Criminal History Category I

---

27. The government also argues that the two cases should be considered separate and unrelated under U.S.S.G. § 3D1.3 and 4, which would increase the Guideline Range. There

is no basis to do so. Both cases are related, due to the similar nature, the individuals involved (Frenzo, Nelson and Astronomo) and the time period.

to III on several grounds: a) Astronomo's statements "describing his own ongoing criminal activities, most of them in furtherance of organized crime, over a period of years, including murders, violence, and threats of violence" and his enthusiastic efforts to assist in laundering; b) the observation of a police officer that he was carrying nunchaku sticks or "nunchuks", which are an illegal weapon.[28]

The Guidelines direct the Court to look to the formal record of conviction first, precisely so that judges do not try offenses long after memories dimmed, or are wrongly refreshed, after witnesses scatter and evidence degrades. *United States v. Footman*, 66 F.Supp.2d at 99. The court is supposed to review the defendant's record of convictions and the punishment he received, and determine the criminal history score. But recognizing that the formal scoring cannot be entirely adequate to the task, § 4A1.3 permits the court to depart where "reliable" information indicates that the formal score does not adequately reflect the defendant's culpability or the likelihood of recidivism.

Still, the Guidelines focus on the formal record: The policy statement in § 4A1.3 describes the kind of data that may be relevant to the court's determination of the "adequacy" of the criminal history category. Again, there is an emphasis on convictions, and the circumstances surrounding them—in effect, asking the question—what is it about the score which created the under (or over) valuation of the record?: (i) prior sentences not counted in computing criminal history (e.g., foreign sentences), (ii) prior sentences of "substantially more than one year" that derive from independent crimes on different occasions, see § 4A1.3(a) and (b); (iii) the timing of

convictions—did they follow closely one after another, or while another charge was pending, see U.S.S.G. § 4A1.3 (d); and (iv) the nature of the convictions,—e.g., assaultive behavior or nonviolent conduct. *See Footman, supra* at 99.

In addition, the Guidelines permit the court to reexamine the sentences the defendant has already received. Commentary to U.S.S.G. § 4A1.3 suggests that a court may second guess the sentences imposed by other courts, i.e., "a defendant with an extensive record of serious, assaultive conduct who had received what might now be considered extremely lenient treatment in the past might have the same criminal history category as a defendant who had a record of less serious conduct."

Finally, the Guidelines permit a court to go beyond the formalities of convictions and sentences, with U.S.S.G. § 4A1.3(e) allowing it to consider "prior similar adult criminal conduct not resulting in a criminal conviction," so long as the information is "reliable." U.S.S.G. § 4A1.3, cmt.background. But, this is an avenue to be pursued with caution, as I noted in *Footman, supra:*

> To be sure, just because the Guidelines seem to give a judge the discretion to look to criminal conduct rather than convictions, it does not mean that a judge should do so. Once one ventures past formal convictions, and formal sentences, one is in troubling territory. How can the court reconstruct prosecutions long past? Should the court essentially retry the past conduct, or rely on police reports which may well be skewed? And if a matter has been dismissed, or worse, resulted in an acquittal, how can the court, many years

---

**28.** Nunchuks are made of two sticks of hardwood joined together at one end by a chain, leather or rope. These sticks are considered to be an illegal weapon under G.L.c. 269 § 10(b).

hence, substitute its judgment for that of the original decision-maker?

The government dramatizes all of the concerns I raised in *Footman* in the arguments it makes here.

First, Astronomo's formal record does not suggest *any* crimes. He scored in criminal history category I. He was charged with disorderly conduct in 1993 for which he received a continued without a finding, and then a dismissal. The government had the temerity to bring the arresting officer, Joseph Acosta, who charged disorderly conduct, to reconstruct what went on in 1993. He testified that Astronomo, ostensibly the bouncer of the club, was assaulting someone with nunchuks. Acosta did not charge that in 1993 because he had only observed a fight from a distance. A weapon was found but Acosta believed at the time that it could not be attributed to any one of the participants. Now, eight years later, he manages to do better—identifying Astronomo as the person with the nunchuks assaulting another.

I will not recast Astronomo's minor arrest into a more serious one for the purposes of an upward departure based on Officer Acosta's post hoc reconstruction.[29]

Second, the government would have me try not just similar adult criminal conduct, but wholly different conduct, and conduct never investigated, charged or remotely corroborated. to boot.

While § 4A1.3 is phrased broadly, in fact the cases in which upward departures have been granted typically involve some sort of formal proceeding—a formal investigation by the police, a vacated sentence, or some official act that gives credence to the additional criminal conduct.

For example, in *United States v. Tabares*, 951 F.2d 405, 411 (1st Cir.1991), the defendant did not deny or contest any of the facts in the presentence report; thus, the court held, "There is no reason here ... to doubt that these acts occurred. The only legal question is whether or not they provide an adequate basis for increasing the criminal history category. In our view, given their serious nature, these acts do provide such a basis." *Id.* at 411. In *United States v. Ramirez*, 11 F.3d 10, 14 (1st Cir.1993), the defendant had the following on record as prior criminal conduct: "three charges of assault with a dangerous weapon (once a broom handle, once a BB gun, and once a handgun), the last of which is still pending; and one charge of driving to endanger, death resulting ... which is still pending." *Id.* at 12. Moreover, the First Circuit noted specifically in both cases that there were no defense objections to the presentence report. *Ramirez*, 11 F.3d at 14; *accord Tabares*, 951 F.2d at 411 ("In this case, as in *Tabares*, appellant received a full opportunity to object to these descriptions" and did not do so.).

Likewise, in *United States v. Diaz–Martinez*, 71 F.3d 946 (1st Cir.1995), and *United States v. Doe*, 18 F.3d 41 (1st Cir.1994), departures were also based on either uncounted previous convictions or previous charges that did not result in a conviction. In *Diaz–Martinez*, the First Circuit affirmed the district court's upward departure from CHC II to CHC IV where the grounds for the departure were "(1) that the defendant had engaged in prior similar criminal conduct (including weapons offenses) that had not resulted in conviction; and (2) that the defendant, at the time he committed the federal offense, had been

---

**29.** Nor do I credit Trooper Frenzo's general recollection that he has seen Astronomo with nunchuks.

released on bail pending trial on charges filed in the local court, thus demonstrating a serious lack of respect for the judicial system and a high risk of recidivism. These are both encouraged grounds for upward departure." *Id.* at 952. In *Doe,* the defendant had a "virtually unbroken chain of assaultive behavior" as reflected in uncounted juvenile convictions or older convictions. *Id.* at 45. Additionally, when Doe was arrested, "he led the police on a high speed chase through city streets ... which ended when he crashed into other cars and a subway tunnel barrier. Endangering the lives of others in this way makes the instant case unusual, in principle permitting a departure." *Id.* at 48.

In *United States v. Brewster,* 127 F.3d 22, 26 (1st Cir.1997), the court upheld a criminal-history-based sentence upgrade for the defendant that was based on uncharged prior criminal conduct (domestic abuse) dissimilar from the crime of conviction. In this case, the district court did not depart based upon the domestic abuse alone; the judge also took into consideration seven prior convictions for serious crimes, as well as the defendant's refusal to participate in both an alcohol abuse program and a domestic violence counseling program. *Id.* at 25. The judge noted that the uncharged criminal conduct—domestic abuse—was corroborated by multiple sources, observing that "such independent corroboration is a prime indicator of reliability in the sentencing milieu." *Id.* at 28. Finally, the judge took into account the defendant's refusal to object to the government's accusations when given an opportunity to do so, observing that this conduct "can itself be viewed as an indicium of the proffered information's trustworthiness." *Id.* at 28.

However, the *Brewster* court added an admonition which I find telling:

[W]e should approach 'dissimilar conduct' departures, like all other departures, with great circumspection. Our holding will have force only in instances in which the uncharged, dissimilar conduct is so serious that, unless it is factored into the sentencing calculus, the resultant CHC will be manifestly deficient as a measure of the defendant's past criminality ... *Moreover, we anticipate that we will encounter relatively few defendants who have substantial records of serious, dissimilar criminal conduct that has never been brought to contemporaneous official attention.*

*Id.* at 27 n. 3 (emphasis added).

Here, absolutely nothing is corroborated or even charged. The government did not try. There is no investigation; there are no independent accounts. Throughout the case, there are two explanations for Astronomo's words: They are either exaggerations to impress the listener, or they are true. I have no idea which it is. For example:

The defendant represented that he had done a "hit" with one Bobby Bolero. The victim was an accountant, who owed the "Family" money; they put his feet in buckets of cement and threw him into the water. The FBI never followed up: Was there a report of a missing accountant? Did any other informant speak about such an event? Who and where is Bobby Bolero?

Then Astronomo told Davis that a neighbor poisoned his German shepherd and that he shot up the neighbor's car in response. Was there any proof that Astronomo even had such a dog? Any similar incident reports in Somerville?

Or Astronomo said that if someone did not pay debts owed "Skinny" he would threaten them with ending up in the trunk of a car in Wonderland, or a dumpster. The defendants' words—which I both

heard on tape and which were related to me through the agents' testimony—were surely menacing. While I agreed to continue Astronomo's detention before trial, based on those words, after hearing Astronomo over and over again on the tapes, I have come to a different conclusion.

Astronomo talked about a prostitution business in Everett, near Malden; no one investigated it. He indicated that he had guns and would get a gun for Frenzo. He never did. He was never even seen with guns. He talked about hiding assets, getting "clean" guns, etc. Yet again, it was not at all clear whether this rhetoric came from real experience, talk on the street, or the movies. He was described by Frenzo as an "expert in the martial arts," again without corroboration.

Finally, as part of the criminal history upward departure, the government would count the multiple money launderings to which they previously referred. The same concerns to which I have already alluded preclude counting those instances as prior criminal history.[30]

### D. *Summary*

Nothing in this memorandum should be interpreted as a determination that Astronomo *did not do* the acts alleged. I cannot say that. He may have been all that the government now portrays him to be.

But the government has the burden of proof and notwithstanding how limited that burden is—fair preponderance of the evidence—it was not met here. It was available to the government to make a better case—to investigate further if Astronomo was as bad as they now say he was, to charge for additional crimes, to seek additional confirmation of monies laundered. They chose not to do so. And

in this second string fact-finding process, made even more "second string" by the evidence the government presented, I cannot make head or tail of what the facts are.

**SO ORDERED.**

---

[30] In any case, the government cannot have it both ways—count the money launderings as additional relevant conduct and as a additional criminal history points.